**HEALTHPOINT, LTD., Plaintiff,**

v.

**STRATUS PHARMACEUTICALS, INC., Defendant.**

**Stratus Pharmaceuticals, Inc., Counterclaim Plaintiff,**

v.

**Healthpoint, Ltd., Counterclaim Defendant.**

**No. SA–00–CA–726–PM.**

United States District Court, W.D. Texas, San Antonio Division.

June 1, 2001.

Charles W. Hanor, Gunn, Lee & Hanor, P.C., San Antonio, TX, C. David Kinder, Kirt S. O'Neill, Saul H. Perloff, Akin, Gump, Strauss, Hauer & Feld, L.L.P., San Antonio, TX, Eric W. Cernyar, San Antonio, TX, for plaintiff.

Lisa A. Vance, Law Offices of Lisa Vance, San Antonio, TX, Thomas Allen Rasmussen, Law Offices of Lisa A. Vance, PC, San Antonio, TX, Dawn Ferrell Clements, San Antonio, TX, Jacqueline M. Stroh, Crofts & Callaway, P.C., San Antonio, TX, Steven M. Davis, Becker & Pollakoff, P.A., Miami, FL, for defendant.

### MEMORANDUM DECISION AND ORDER

MATHY, United States Magistrate Judge.

Pursuant to the consent of the parties to disposition before a United States Magistrate Judge[1] and consistent with the authority vested in United States Magistrate Judges under the provisions of 28 U.S.C. § 636(c) and rule 1(i) of the Local Rules for the Assignment of Duties to United States Magistrates, effective January 1, 1994, in the Western District of Texas, the following Memorandum Decision and Order is entered regarding the parties' cross motions for preliminary injunction.

---

1. Docket nos. 13, 20 and 22.

## I. *JURISDICTION*

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and 1367 and 15 U.S.C. §§ 1116 and 1121.

## II. *PROCEDURAL HISTORY*

By way of introduction, this lawsuit concerns competing enzymatic wound ointments, Accuzyme and Panafil[2] made by Healthpoint Ltd. ("Healthpoint") and Kovia and Ziox made by Stratus Corporation ("Stratus"). Each of the ointments is available by prescription only. Healthpoint began marketing Accuzyme in 1996 after reverse-engineering Panafil White, a papain-urea debridement ointment then marketed by Rystan. Thereafter, Healthpoint spent millions of dollars promoting Accuzyme, creating brand awareness and market acceptance. Prior to the filing of this lawsuit, Healthpoint acquired the rights to Panafil White. In April 2000, Stratus began marketing both Kovia, a papain-urea wound debridement ointment, which Stratus created by attempting to replicate Accuzyme, and Ziox, a wound care ointment which Stratus created by attempting to duplicate Panafil White.

When introducing the products, Stratus promoted Kovia and Ziox as a "generic to Accuzyme ointment"[3] and Kovia as "generic to Panafil ointment."[4] Stratus distributed a wholesale price list that referred to Kovia and Ziox as "branded prescription generic products."[5] Using and industry form called a "wholesaler new item fact sheet," Stratus filled out the section of the form "for generic drug products," indicating, among other things, that the "brand name equivalent" for Kovia was Accuzyme[6] and the "brand name equivalent" for Ziox was Panafil.[7] Stratus provided these forms to data collection agencies such as First Data Bank (which then "linked" Accuzyme and Kovia and "linked" Ziox and Panafil White in its computer data base to which pharmacists and others subscribe), to drug wholesalers and to others. Stratus also submitted similar information to the Texas Department of Health when Stratus applied for Kovia and Ziox to be included in the Texas state medicaid formulary[8] and to Alabama[9] when seeking the inclusion of Kovia into the Alabama state medicaid formulary. Stratus represented Kovia to be "a generic of Accuzyme ointment" when bidding for a contract with Cook County Hospital in Illinois.[10]

At some point in the spring of 2001, well after the filing of this case, Stratus voluntarily stopped referring to Kovia and Ziox as "branded prescription generic products" and stopped promoting Kovia and Ziox as

---

**2.** Healthpoint's Panafil product is marketed under the trade name and registered trade mark "Panafil" (*see* PE 11) but is often referred to as "Panafil White" to distinguish Healthpoint's Panafil product from "Panafil Green" which is marketed by Rystan. Healthpoint purchased Panafil White from Rystan. References in this Order to "Panafil" or "Panafil White" refer to Healthpoint's Panafil product unless otherwise noted.

**3.** PE 36A and PE 71E.

**4.** PE 71E.

**5.** PE 69.

**6.** PE 48A.

**7.** PE 59.

**8.** PE 48 (Kovia listed as "generic name" to Accuzyme, "product brand name" and "structurally related drug") and PE 49 (Ziox listed as "generic name" to Panafil, "product brand name" and "structurally related drug"). Both forms provided that the Stratus product had an "Orange Book rating" of "DESI."

**9.** PE 65 (Kovia listed as "generic to" Accuzyme in cover memorandum with a wholesaler new item fact sheet attached which, as discussed above, provided information for "generic drug products").

**10.** PE 127.

"generic" to Accuzyme and Panafil.[11] Rather, its current promotional materials contain the following statements: Kovia "contains same active ingredients as Accuzyme"[12] or "contains same ingredients as Accuzyme;"[13] Ziox "contains same active ingredients as Panafil"[14] or "contains same ingredients as Panafil;"[15] and both Kovia and Ziox are "quality economical alternatives" in promotional materials that also mention Accuzyme and Panafil, respectfully.[16]

This case began on or about July 28, 2000 when Healthpoint filed its original complaint seeking damages and preliminary and permanent injunctive relief against Stratus for unfair competition, dilution, and false advertising in violation of the Trademark Act of 1946, 15 U.S.C. §§ 1051, *et seq.*, and for unfair competition, palming off, false advertising, misappropriation and dilution under Texas law.[17] Healthpoint's third amended complaint, its "live" pleading in this case, alleges eight causes of action.[18] Five of the causes of action allege: federal false designation of origin, false description and false representations of fact in violation of § 1125(a)(1)(B) of the Lanham Act; common law false advertising; federal unfair competition in violation of § 1125(a) of the Lanham Act; common law unfair competition; common law palming off. These causes of action are based on false representations that: Kovia and Ziox are "generic" to Accuzyme and Panafil; Kovia and Ziox can be substituted for prescriptions of Accuzyme and Panafil; Kovia and Ziox "deliver the same amount of active ingredient in the same time frame and have the same quality, strength, purity and stability as Healthpoint's debridement agents;" Kovia and Ziox "have undergone clinical testing to confirm that it is equivalent to" Healthpoint's two ointments; and Kovia contains "papain in sufficient quantities to debride" when not all of Kovia contains papain and some of Kovia contains "little or no papain." Additional causes of action allege: misappropriation "of Healthpoint's reputation and good will;" tortious interference "with the business of Healthpoint;" and civil conspiracy "to wrongfully and unfairly misappropriate Healthpoint's goodwill and business."[19] Healthpoint demands a jury and requests, on certain of its claims as specified, damages, an accounting of profits, treble damages, punitive damages, a recall of Stratus' debridement products, attorney's fees, costs, prejudgment interest, and permanent and preliminary injunctive relief.[20]

On January 31, 2001, after initially contesting the Court's personal jurisdiction, Stratus consented to personal jurisdiction[21] and filed a counterclaim alleging five causes of action alleging claims of: false advertising in violation of § 1125(a) of the

---

11. *Compare* PE 69 *with* PE 111.

12. PE 31.

13. PE 29.

14. PE 31.

15. PE 29.

16. PE 31.

17. Docket no. 1. On October 4, 2000, Healthpoint filed its first amended complaint, adding additional factual allegations related to personal jurisdiction (docket no. 11). On No-

vember 7, 2000, Healthpoint filed a substituted first amended complaint (docket no. 23) and on March 5, 2001, Healthpoint filed a second amended complaint (docket no. 91).

18. Docket no. 152.

19. Docket no. 152.

20. Docket no. 152.

21. On September 11, 2000, Stratus filed a pre-answer motion to dismiss for lack of personal jurisdiction, to quash service and, alternatively, a motion for summary judgment ar-

Lanham Act in connection with allegedly false statements which Healthpoint made about Kovia that Kovia is "not an alternative" to Accuzyme, that Kovia is "inferior" and is "not safe," that "under federal law manufacturers must seek approval to market a generic drug by submitting data demonstrating that one drug product is therapeutically equivalent to the other," and that "the amount of papain in Kovia is an inefficient and ineffective quantity;" both false advertising and unfair competition in violation of § 1125 of the Lanham Act in connection with the alleged misbranding of Accuzyme; and common law claims of unfair competition, injurious falsehood and interference with prospective business relationships.[22] Stratus requests damages, punitive damages, treble damages, an accounting of Healthpoint's profits, a recall of Healthpoint's debridement products, attorney's fees, costs, pre-judgment interest and preliminary and permanent injunctive relief on various of its claims.[23]

With respect to the requests for preliminary injunctive relief, Healthpoint filed a motion for preliminary injunction against Stratus on October 19, 2000,[24] as supplemented.[25] On November 14, 2000, Stratus filed its response and objection to the motion for preliminary injunction.[26]

On January 31 2001, the same day on which it consented to personal jurisdiction, Stratus filed its cross motion for preliminary injunction and brief in support.[27] On April 18, 2001, after several unopposed extensions of time, Healthpoint filed its response to the motion for preliminary injunction.[28]

On February 27, 2001, both Healthpoint's motion for preliminary injunction and Stratus' cross motion for preliminary injunction were set for a hearing to begin on May 7, 2001.[29] Beginning May 7, 2001 and ending on May 10, 2001 the Court held a consolidated evidentiary hearing on the two, cross motions for preliminary injunction.

At the beginning of the May 7 hearing, Healthpoint orally moved to expand the scope of its motion for preliminary injunction to include Ziox as well as Kovia and proffered that it would rely on the same legal arguments as already expressed in its legal briefs but requested permission to develop the record regarding claims made by Stratus in marketing Ziox. Healthpoint proffered that Stratus' representations about Ziox were very similar to the claims made about Kovia and often were made at the same time (given that both ointments concern wound care). Initially Stratus op-

guing that Healthpoint had failed to allege facts sufficient to show that defendant had adequate minimum contacts to support jurisdiction in Texas or that the Court could assert specific of general jurisdiction over defendant (docket no. 5). The filing of this motion, as reflected by the record, ended merits-related discovery in this case, *see* docket nos. 37 and 49, as well as further consideration of Healthpoint's requested preliminary injunctive relief until January 31, 2001 when Stratus consented to the jurisdiction of the Court (docket no. 68) and, on that same day, filed a cross motion for preliminary injunction (docket no. 70).

22. Docket no. 69. Healthpoint filed a timely answer to the counterclaim. Docket no. 78.

23. Docket no. 69.

24. Docket no. 17.

25. Docket no. 12. The supplement was filed before the motion and brief in support because of the pendency of a motion to file a brief in excess of the page limitations provided by the Local Rules (docket nos. 10 and 15).

26. Docket no. 34.

27. Docket nos. 70 and 73.

28. Docket no. 131.

29. Docket no. 88.

posed the expansion of the hearing, arguing that it would be prejudiced by Healthpoint amending its motion at such a late date, but later offered that its witnesses on "FDA issues" who had been scheduled to testify at the May 7 hearing would cover "FDA issues" regarding both Kovia and Ziox. It was resolved that so long as Stratus could supplement the record with any Ziox-related issues, the hearing beginning May 7 would address Ziox as well as Kovia.[30]

Healthpoint called eight witnesses to testify in person at the May 7, 2001 hearing: Philip Johnson, Gerald Meyer, Gary G. Heyland, Charles R. Cervantes, M.D., Alberto Hoyo, Mr. J.R. Locey, Larry Anderson and Angela Davis. In addition, Healthpoint presented deposition excerpts of the testimony of Juan Carlos Billoch, Peggy Goodnight and Lawrence Allen Rheins, Ph.D.[31]

Stratus called two witnesses to testify in person at the May 7 hearing: Gordon R. Johnston and Alberto Hoyo. In addition, Stratus presented deposition excerpts of the testimony of Kay Morgan, Peggy Goodnight, David Hobson, Mark Mitchell, Lawrence Allen Rheins, Ph.D, and Mark Newman.[32] Further, for purposes of the preliminary injunction hearing, the parties agreed to a supplement to the deposition of Lawrence Rheins with a short statement of additional facts in lieu of personal testimony.[33]

Numerous exhibits were introduced into evidence. Both sides were allowed the opportunity to submit counter-designations of deposition testimony and post-trial briefs.[34]

The Court enters this Order to summarize findings and conclusions on the motions for preliminary injunction.[35] The Or-

**30.** Based on the announcement that the parties anticipated the motion hearing would end on Wednesday, May 9, 2001, the Court set any additional hearing required by Stratus to supplement the record regarding Kovia for Monday, May 14, 2001. At the conclusion of the case, Stratus announced that it would not be asking to supplement the record with any additional information about Ziox. Therefore, with the exception of the submission of counter-designations of deposition excerpts to be submitted on May 14, 2001, the evidentiary record on the cross motions for preliminary injunction closed on May 10, 2001.

**31.** Marked for identification purposes as PE 118, PE 199 and PE 120, respectively.

**32.** Marked for identification purposes as DE 48 through DE 53, respectively.

**33.** This supplement was received into evidence as DE 54, for the purposes of the preliminary injunction hearing.

**34.** Healthpoint's counter-designations of deposition excerpts for Kay Morgan, Mark Mitchell, Mark Newman and Dave Hobson were filed May 14, 2001 (docket no. 155). Stratus did not file any post-hearing counter-designations. It was agreed, that any objec-

tion, whether as to form or to substance, raised in a portion of a deposition designated would be waived for purposes of the preliminary injunction unless the party asked for a ruling during the course of the May 7 hearing or, with respect to post-hearing deposition designations, filed a separate pleading to preserve the objection.

Both sides filed trial briefs or responses. While the hearing was in progress, Healthpoint filed a trial brief in support of equitable relief (docket no. 153). On May 17, 2001, Healthpoint filed a trial brief on the availability of relief under the Lanham Act (docket no. 159). Stratus filed: an advisory on the relief it sought through a preliminary injunction on May 17, 2001 (docket no. 160) (filed in response to some pages handed up to the Court and provided to counsel in connection with Healthpoint's closing argument); and responses to each of Healthpoint's trial briefs on May 18, 2001 (docket nos. 164 and 167).

**35.** On May 9, 2001, Healthpoint filed a motion for contempt based on violations of the discovery orders. On May 17, 2001, Stratus filed its sealed response to this motion (docket no. 161). On May 29, 2001, Stratus filed a motion for contempt based on alleged discov-

der has not been sealed.[36]

## III. ISSUES

1. Has Healthpoint satisfied its burden of proving entitlement to a preliminary injunction; and
2. Has Stratus satisfied its burden of proving entitlement to a preliminary injunction.

## IV. PRELIMINARY INJUNCTION STANDARDS

In this Circuit, the test for entitlement to a preliminary injunction has four parts. A preliminary injunction may be granted *only* if the moving party establishes each of the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest.[37] A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.[38]

An evidentiary hearing is not always required before a court rules on a preliminary injunction. If factual matters are not in dispute, no oral hearing is required and the parties need only be given "ample opportunity to present their views of the legal issues involved."[39] On the other hand, "when factual disputes are presented, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted."[40] The basic question on the need for a hearing is whether it will add anything material to the Court's consideration of the case.[41] Evidence at a hearing on a preliminary injunction need not be "testimonial" and affidavits can be considered by the Court.

The four-day evidentiary hearing concerning these ointments, the parties' sub-

---

ery violations (docket no. 176). To the extent that Healthpoint's motion asks "the Court to find all favorable inferences for Healthpoint that could have been proved by the missing documents in favor of Healthpoint and against Stratus" (docket no. 154 at 10), for the purposes of this Order, the motion is *denied.* A separate Order will be entered on these motions.

**36.** On November 28, 2000, the parties entered into a joint, agreed protective order that provided, in sum, that certain information which had been designated "confidential" or "attorney's eyes only" should be sealed (docket no. 43). No party has requested that the official record of the preliminary injunction hearing be sealed or that this Order be sealed, even temporarily.

**37.** *See e.g., Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998); *Cherokee Pump &*

*Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994).

**38.** *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir.1997).

**39.** *Kaepa v. Achilles,* 76 F.3d 624, 628 (5th Cir.), *cert. denied,* 519 U.S. 821, 117 S.Ct. 77, 136 L.Ed.2d 36 (1996). *See Miller Brewing Co. v. Ft. Worth Distrib. Co.,* 781 F.2d 494, 496 (5th Cir.1986); *Commerce Park at DFW Freeport v. Mardian Construction Co.,* 729 F.2d 334, 341 (5th Cir.1984). *See also Campbell Soup Co. v. Giles,* 47 F.3d 467, 470 (1st Cir.1995); *Stanley v. University of Southern Cal.,* 13 F.3d 1313, 1326 (9th Cir.1994) (no abuse of discretion to deny party right to call witnesses).

**40.** *Kaepa,* 76 F.3d at 628; *Commerce Park at DFW Freeport,* 729 F.2d at 341.

**41.** *Cf., Parker v. Ryan,* 959 F.2d 579, 584 (5th Cir.1992); *Worlds of Wonder, Inc. v. Veritel Learning Sys., Inc.,* 658 F.Supp. 351, 354 n. 2 (N.D.Tex.1986).

mission of declarations [42] or deposition excerpts in lieu of testimony, and the parties' ability to object to evidence and to counter-designate deposition excerpts, provided the parties with sufficient opportunity to develop disputed facts relevant to the motions for preliminary injunction.[43]

As a final procedural matter, Healthpoint made a *"Daubert"* objection to Stratus' expert, Mr. Johnston, and Stratus made a similar objection to Healthpoint's expert, Mr. Meyer. Neither side asked for any consideration or findings under *Daubert* and *Kumho Tire* [44] with respect to the admissibility of the testimony for purposes of the preliminary injunction hearing.[45] Rather, both sides stated that the objection was made in order to preserve the objection for the time of trial.

## V. ANALYSIS: FINDINGS OF FACT; CONCLUSIONS OF LAW

### A. Summary of the Allegations

Healthpoint's motion for preliminary injunction is based on its false advertising claims [46] and alleges that Stratus has provided false and misleading information, including the following alleged misrepresentations: [47]

(1) By representing Kovia as a "generic" or "generic alternative" to Accuzyme, Stratus is implying that Stratus "has obtained FDA approval for Kovia" but Kovia has not been approved as a "generic" drug by the FDA; [48]

**42.** Both sides submitted declarations as attachments to its preliminary injunction briefs which have been considered by the Court in issuing this Order. No party filed any separate objections to the such evidentiary materials. Reference within this Order to any portion of any declaration to which there was an objection addressed in the preliminary injunction briefs shall be considered to overrule the objection except to the extent the objection relates to the weight to be given to the evidence.

**43.** *U.S. v. Premo*, 511 F.Supp. 958 (D.N.J. 1981) (11–day hearing conducted on 8 products involving the "generic/new drug issue").

**44.** *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**45.** To the extent that these objections impose an obligation on the Court to recognize independently its gate-keeping function under *Daubert* and *Kumho Tire*, the Court finds by a preponderance of the evidence that, for the purposes of the cross-motions for preliminary injunction, the expert opinion testimony in question constitutes specialized knowledge that will assist the trier of fact, the evidence is relevant to the issues in this case, is sufficiently reliable and the witnesses are qualified to provide the evidence. These limited findings are made without prejudice to further consideration of any *Daubert* challenge made to these or other witnesses that may be made in connection with the trial.

During the course of Mr. Johnston's testimony, Healthpoint made additional objections regarding the scope of his expert opinions and related points. As also reflected by the hearing record, the Court has considered such additional objections in assessing the weight to be given to the evidence.

**46.** Docket no. 17 at 14. Healthpoint also presented argument at the May 7 hearing that it should be granted a preliminary injunction based on its "palming off" cause of action. This cause of action was not pleaded as a ground in its motion for preliminary injunction but, as noted below, the motion did argue improper substitution was occurring. As discussed further below, this Order fully considers any "palming off" evidence and argument in reference to the false advertising claims.

**47.** As noted, on May 7, 2001, Healthpoint requested leave to expand the scope of its preliminary injunction to cover Ziox as well as Kovia. Therefore, when applicable, the arguments in Healthpoint's motion for preliminary injunction that address Kovia have been read to apply to Ziox as well. Of the categories of false or misleading statements discussed in Healthpoint's motion and outlined herein, only the last three would appear to apply to Kovia and not Ziox.

**48.** Docket no. 17 at 16.

(2) By representing Kovia as a "generic" or "generic alternative" to Accuzyme, Stratus implies that Kovia "has identical amounts of the same active chemical ingredients in the same dosage form; that it meets Stratus' standards of strength quality and purity; and that, if administered in the same amounts, will produce the same therapeutic effect, identical in duration [and] intensity," but that Kovia "has far less papain activity than the Accuzyme product," and "the variance of papain activity from one Kovia tube to another in these tests is extreme indicating that Stratus fails to comply with good manufacturing practice." [49]

(3) By promoting Kovia as "generic for Accuzyme, Stratus takes advantage of laws and contract provisions requiring or encouraging substitution of generic drugs for brand name drugs" because "[i]f the labels are the same, as they are in this case ... and the proprietor of the purported generic equivalent claims that they are the same, then pharmacists are likely to substitute the purported generic equivalent for the brand name drug;" [50]

(4) By representing "Kovia as a 'generic' drug implies that ... pharmacists and physicians can be assured that the drug has met the same rigid safety, efficacy, and quality-control standards met by the Accuzyme product;" [51]

(5) Kovia "is not a generic form of, but rather is inferior to and less effective than, the Accuzyme product" [52] because tests show that Kovia "has significantly less papain activity" than Accuzyme, because, with "less papain activity, Kovia would not work as well as" Accuzyme, and, accordingly, Kovia "is not pharmaceutically equivalent, therapeutically equivalent or bioequivalent to Accuzyme;" [53]

(6) Stratus has falsely stated that "Kovia and Accuzyme are bioequivalent" and that assay results show that the ranges for urea and papain are within the "USP acceptable range" of "90% to 110%;" [54] and

(7) "Kovia is a misbranded and adulterated drug" due to test results which show an "appalling absence of papain activity" in Kovia lot 5025, "distressingly low amount of papain activity" in Kovia lot 5041 and "the variation in papain activity between the two." [55]

With regard to the alleged false representations and misbranding, Healthpoint requests the Court to order Stratus, in sum: (1) to stop comparing its wound care products with Healthpoint's wound care products; (2) to correct the false and misleading information Stratus has provided about Kovia, Accuzyme, Ziox and Panafil White by informing past and future purchasers that Kovia and Ziox are not "generic" alternatives to Accuzyme and Panafil White, that Kovia and Ziox have "not been approved by the FDA" and that Kovia has "not been produced in accordance with good manufacturing practices;" and (3) to recall all packages of Kovia and Ziox.[56]

Stratus' cross motion for preliminary injunction is based on its false advertising

49. *Id.*

50. Docket no. 17 at 7–9.

51. Docket no. 17 at 16.

52. Docket no. 17 at 9.

53. Docket no. 17 at 10.

54. Docket no. 12 at 1 and attachment (Aug. 29, 2000 letter from Sonar Products to Stratus).

55. Docket no. 17 at 13.

56. Docket no. 17 at 23–24 and 25–27 and attached proposed order.

claim and alleges that Healthpoint has made false and misleading statements, including the following misrepresentations which state or imply that: [57]

"(1) Kovia is not an alternative to Accuzyme;

(2) Kovia is ineffective or inferior to Accuzyme in any respect;

(3) It is illegal or otherwise in violation of federal or state law to prescribe, dispense or administer or use Kovia in place of Accuzyme;

(4) Kovia is not an alternative to Accuzyme because it is not 'AB rated' or 'A' rated;

(5) Accuzyme has been approved by the FDA for marketing or use;

(6) Kovia requires an FDA approval or rating or that it is in any respect inferior to Accuzyme because it lacks any FDA approval or rating;

(7) Stratus puts out inferior drugs;

(8) Kovia is dangerous or unsafe; and

(9) There are no generic equivalents to Accuzyme." [58]

Stratus also claims that Healthpoint misbranded Accuzyme or impermissibly has marketed Accuzyme under two labels. At the hearing, Stratus claimed that Healthpoint falsely stated that Stratus has no sales force.[59]

Stratus requests the Court to order Healthpoint, in sum, to stop making the above-noted false representations; to enter relief regarding Accuzyme's label; to correct the false and misleading information Stratus has provided about Kovia, Accuzyme and Stratus; to recall all packages of Accuzyme due to the labeling/misbranding problem; and to inform all past and future purchasers of Accuzyme that Accuzyme has not been made in accordance with good manufacturing practices.[60]

## B. *Primary Jurisdiction of the FDA*

As a threshold matter, the Court addresses the primary jurisdiction of the FDA to determine certain issues relating to drugs and their marketing. The primary jurisdiction of the FDA is relevant to an assessment of preliminary injunction burdens such as likelihood of success on the merits and irreparable harm.

### 1. *Summary of Selected Cases and Analytical Framework*

Section 337(a) of the FDCA provides that "all such proceedings for the enforcement, or to restrain violations of [the Act] shall be in the name of the United States." Construing this language and considering related arguments, courts have held that the FDCA does not create a private right of action to enforce or restrain the provisions of the FDCA or FDA regulations.[61] Courts have held that a party should not be allowed to use the Lanham Act or a related common law cause of action to

---

57. Stratus did not ask, reciprocally, to amend its preliminary injunction motion to apply to Ziox as well as Kovia.

58. Docket no. 70 at 1–2.

59. DE 10 at 1 and DE 28 at 1 and 3; *but see* DE 29 at I ("small operation").

60. Docket no. 70 at 2–3 and docket no. 73 at 20–22. *See also* docket no. 160 (post-hearing advisory).

61. In addition to the cases summarized below, *see e.g., PDK Labs., Inc. v. Friedlander,*

103 F.3d 1105 (2d Cir.1997); *Gile v. Optical Radiation Corp.,* 22 F.3d 540, 544 (3rd Cir.), *cert. denied,* 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994); *Bailey v. Johnson,* 48 F.3d 965, 967 (6th Cir.1995); *Pacific Trading Co. v. Wilson & Co.,* 547 F.2d 367, 370 (7th Cir.1976). *Cf., Merrell Dow Pharms., Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) (Supreme Court assumed that there was no private cause of action for FDCA violations, as parties had agreed and lower court had found).

assert, in effect, a violation of the FDCA. Although the parties have not cited any Fifth Circuit precedent on point, courts have held that allegations of false and misleading advertising that "stray[ ] too close to the exclusive enforcement domain of the FDA" [62] are impermissible attempts to circumvent section 337(a)'s denial of a private right of action. Courts have held expressly that mere false claims that a drug has been approved by the FDA when it has not are not actionable under the Lanham Act. A brief discussion of a few of the cases addressing this issue is instructive as to the general framework for drawing the boundary between the FDCA and FDA enforcement domain, on the one hand, and permissible Lanham Act and related common law claims, on the other.

In *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, plaintiff brought a Lanham Act claim, alleging that defendant falsely listed an ingredient as "inactive" on a cough syrup label when the FDA required that the ingredient be labeled as "active".[63] Defendant argued that plaintiff's claim was a misbranding violation of the FDCA for which there was no private right of action. The Third Circuit affirmed the district court's denial of a preliminary injunction, agreeing with the district court that plaintiff had not demonstrated likelihood of success on the merits; because the FDA had *not* found conclusively that the ingredient should be labeled as "active" under FDA regulations, plaintiff had not shown that the labeling was false. The Third Circuit stated:

[plaintiff's] position would require us to usurp administrative agencies' responsibility for interpreting and enforcing potentially ambiguous regulations. Jurisdiction for the regulation of OTC drug marketing is vested jointly and exhaustively in the FDA and the FTC, and is divided between them by agreement. Neither of these agencies' constituent statutes creates an express or implied private right of action and what the [FDCA] and the FTC Act do not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation of these Acts or their accompanying regulations.[64]

The Court held that "[b]ecause agency decisions are frequently of a discretionary nature or frequently require expertise," the court would not preempt the exercise of that discretion by directly applying FDA regulations through the Lanham Act to address what was, in effect, a misbranding claim, governed by FDA regulations, concerning a subject matter that the FDA had not yet resolved.[65]

In *Mylan Laboratories, Inc. v. Matkari*, the Fourth Circuit reversed the Rule 12(b)(6) dismissal of plaintiff's Lanham Act claim that defendants had falsely represented that their product was the "bioequivalent" of plaintiff's product and upheld the Rule 12(b)(6) dismissal of plaintiff's claim that defendants had falsely represented that their drugs had been approved by the FDA merely by the act of offering them in the market.[66] The district court

---

**62.** *Summit Technology, Inc. v. High–Line Med. Instruments Co., Inc.*, 922 F.Supp. 299, 306 (C.D.Cal.1996) and 933 F.Supp. 918, 933 (C.D.Ca.1996).

**63.** 902 F.2d 222, 230 (3rd Cir.1990).

**64.** 902 F.2d at 231.

**65.** *Id.*

**66.** 7 F.3d 1130, 1138–39 (4th Cir.1993), *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). *Mylan* has been cited on numerous occasions. *See e.g., Summit I*, 922 F.Supp. at 306, discussed below, which found the Fourth Circuit's reasoning in *Mylan* "extremely persuasive."

had dismissed Mylan's Lanham Act claims on the ground that Mylan "failed to allege specifically that the defendant's drugs were not in fact bioequivalent."[67] The complaint did not allege specifically that Matkari's drugs were *not* bioequivalent. The Fourth Circuit held that the district court "correctly noted that, in order *ultimately* to succeed on its Lanham Act count, Mylan will have to show more evidence than mere proof that defendants' claims were supported by unpersuasive test results." But, the Fourth Circuit reversed the dismissal of alleged representations of bioequivalence, holding that Mylan's allegations—that defendant had falsely represented that its product was "bioequivalent" to Mylan's counterpart and "other approved generic equivalents," was entitled to an "AB" rating from the FDA, and was the "generic alternative" to Mylan's product—were "sufficiently particularized allegations of false or misleading representations to sustain for now" the Lanham Act claims.[68] The Fourth Circuit reasoned that Mylan could be entitled to relief if it proved that defendant's drugs were not bioequivalent or that the purported studies of bioequivalence had been based on data that was "falsified" or seriously "unreliable" or that the bioequivalence studies "had not been performed" or had been performed "on a drug manufactured differently from the one advertised."[69]

In the same decision, the Fourth Circuit upheld the dismissal of Mylan's claim that the defendant had falsely represented its drug was approved by the FDA by "the very *act* of placing the drug on the market" because such a claim, without evidence of any "advertising which declared 'proper FDA approval,'" was an impermissible attempt to enforce the FDCA and FDA regulations.[70] The Fourth Circuit stated:

> We agree with defendants that permitting Mylan to proceed on the theory that the defendants violate § 43(a) [§ 1125(a) of the Lanham Act] merely by placing their drugs on the market would, in effect, permit Mylan to use the Lanham Act as a vehicle by which to enforce the [FDCA] and the regulations promulgated thereunder. An attempt, by ingenious pleading, to escape one principle of law by making it appear that another not truly appropriate rule is applicable appears to have been attempted. Mylan in short, is not empowered to enforce independently the FDCA. * * * In order to state a proper claim for relief under ... the Lanham Act, Mylan was required to point out *some* claim or representation that is reasonably clear from the fact of the defendants' advertising or package inserts. That it did not do.[71]

In *Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc. ("Grove Fresh I")*, plaintiff alleged that because defendant's orange juice contained additives and adulterants, the representation that the product was "100% orange juice from concentrate" was false.[72] The district court denied defendants' motion to dismiss plaintiff's Lanham Act claim, holding that it was not an impermissible attempt to recover damages for the misbranding of food in violation of the FDCA:

> Grove Fresh relies on the FDA regulation [that defines "orange juice from concentrate"] merely to establish the standard or duty which defendants al-

---

67. *Id.* at 1138.

68. *Id.*

69. *Id.*

70. *Id.* at 1139 (emphasis in original).

71. *Id.* (emphasis in original) (citing *Sandoz Pharmaceuticals Corp.*, 902 F.2d at 230).

72. 720 F.Supp. 714, 716 (N.D.Ill.1989).

legedly failed to meet. Nothing prohibits Grove Fresh from using the FDCA or its accompanying regulations in that fashion. . . . Grove Fresh does not base its claim solely on the FDCA or FDA regulations. Grove Fresh alleges that defendants have violated section 43(a) of the Lanham Act. Even without the FDA regulation defining "orange juice from concentrate," Grove Fresh could attempt to establish a violation of section 43(a). Grove Fresh would simply need to provide other evidence establishing the proper market definition of "orange juice from concentrate." [73]

The court allowed plaintiff to bring a Lanham Act cause of action for affirmatively misrepresenting facts -whether the orange juice was "pure" under a commercial definition—without interpreting any FDA regulation.

Two months later, the same Court (before a different judge) in *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.* (*"Grove Fresh II"*), held that "[w]here Congress has precluded private causes of action under the FDCA, we find it difficult to justify the use of the FDCA to establish a crucial element of a private cause of action under the Lanham Act." [74] To sustain a Lanham Act claim the court held that Grove Fresh would have to "provide other evidence establishing the proper market definition of 'orange juice from concentrate.' " [75]

In *Summit Technology, Inc. v. High–Line Medical Instruments Co.* (*"Summit I"*), the district court dismissed plaintiff's Lanham Act and common law unfair competition claims that defendants had failed to disclose that their ophthalmological laser systems had *not* been approved by the FDA. [76] The Court held that because the FDA had not yet determined that defendants' systems needed approval, allowing plaintiff's Lanham Act claim to proceed would force the Court to decide the legality of defendants' conduct before the FDA had a chance to do so. [77] After plaintiff amended its complaint, the court, in *Summit II*, reiterated that "absent an affirmative representation that a drug has been officially approved by the FDA, a Lanham Act claim alleging that the defendant had failed to disclose FDA non-approval could not stand." [78] The Court explained that an

affirmative misrepresentation that a product has "FDA approval" . . . is actionable because it clearly misstates a fact and does not require an interpretation or application of FDA regulations. . . . [A] court can test the truth of the statement "FDA approval" without any need to interpret FDA regulations. [79]

On the other hand, the Court held that "to test the truth of defendant's apparent claim that it can legally import the Summit lasers, the Court would be required to perform an 'original interpretation' of the FDA regulations governing this area," an exercise the Court was not willing to undertake. [80]

In *Braintree Laboratories, Inc. v. Nephro–Tech, Inc.*, a district court held that allegations the defendant falsely described and misbranded its product as a "dietary supplement" in violation of § 1125(a) and common law unfair competition should be dismissed because it is for the FDA and

**73.** 720 F.Supp. at 716.

**74.** 1989 WL 152670 (N.D.Ill. Nov.29, 1989).

**75.** *Id.* at * 3.

**76.** 922 F.Supp. at 307, 316.

**77.** *Id.*

**78.** 933 F.Supp. at 933.

**79.** 933 F.Supp. at 933 n. 7.

**80.** 933 F.Supp. at 934 ("this the Court cannot do").

not the court to decide whether defendant's product is properly classified as a "dietary supplement" under the FDCA and FDA regulations.[81] This court was unwilling to consider evidence establishing an independent lay understanding of the term "dietary supplement" even though Braintree alleged that Nephro–Tech's labeling of its unapproved product as a "dietary supplement" was false "in the ordinary sense because the calcium in the product is not intended to be absorbed."[82]

In *Eli Lilly & Co. v. Roussel Corp.*, Eli Lilly brought suit against competitors selling bulk cefaclor, an antibiotic, and against other drug companies that purchased the bulk cefaclor for resale in retail dosage units.[83] For many years, Lilly was the only manufacturer of cefaclor but after Lilly's patent expired, a competitor sought FDA approval to sell bulk cefaclor. The FDA approved the abbreviated antibiotic drug application ("AADA"). Later, the FDA informed the competitor that it had found that its AADA contained false and misleading information. Eli Lilly brought suit, alleging a Lanham Act claim that the manufacturer fraudulently had obtained FDA approval by making false statements to the FDA about how and where they manufactured the product and that defendants misleadingly used terms such as "generic," "cefaclor," or "alternative to brand-name drugs" in product inserts and marketing materials implying that the FDA had determined their retail dose of cefaclor was safe and effective.[84]

The district court dismissed Eli Lilly's Lanham Act claims for failure to state a claim, noting that failure to disclose facts is not actionable under the Lanham Act;[85] that if mere marketing a drug is an implied representation that the drug has been approved by the FDA, such a claim is an FDCA violation to be decided by the FDA;[86] and that whether use of the terms "generic," "cefaclor," "alternatives to brand-name drugs," and "safe and effective" implied FDA approval similarly "rely on interpretations of the FDCA" and were not alleged to be affirmative misrepresentations standing on their own.[87] The Court emphasized that "Lilly has not alleged that defendants made false representations as to the quality, bioequivalency or safety of its products. Lilly has not alleged that defendants' cefaclor was not generic cefaclor, or that it was not bioequivalent to Ceclor or that it was not safe and effective."[88] Moreover, "Lilly has not pleaded any facts demonstrating that defendants' generic products did not contain

---

**81.** 1997 WL 94237 *7 (D.Kan. Feb.26, 1997) ("it is not for this court to interpret and apply the statutory definition of 'dietary supplement.' ... even if it were to be determined in litigation that Calphron did not meet some independent, lay understanding of the term 'dietary supplement,' defendants might not be able to remove the term from its label without violating the FDCA and risking suit by the FDA. The possibility of such a dilemma demands that classic misbranding claims, such as the one here at issue, be reserved solely for resolution by the FDA."). Although unreported decisions have no precedential value, given the similarity in the issues, *Braintree Labs.* and *Grove Fresh II* first discussed above, are informative.

**82.** *Id.* at *7.

**83.** 23 F.Supp.2d 460 (D.N.J.1998).

**84.** 23 F.Supp.2d at 470.

**85.** *Id.* at 475.

**86.** *Id.* at 477.

**87.** *Id.* at 476, 479. Significantly, the Court declined to address the claim that by affirmatively stating in ads that the FDA had approved the AADA for generic cefaclor, defendants had falsely conveyed to the public it had legitimately obtained FDA approval. *Id.* at 475 n. 25.

**88.** *Id.* at 479.

the active ingredients in Lilly's Ceclor (cefaclor) as represented."[89] The Court held that, as in *Mylan*, such "broad and conclusory allegations" do "not allege that defendants misrepresented the quality of their products, but are based on defendants' misrepresentations that they properly obtained FDA approval."[90] Absent an express, direct false statement that the FDA had approved the drug or other false statements about the product, false implications of FDA approval are not actionable.

*Eli Lilly* relied in part on *Barr Labs., Inc. v. Quantum Pharmics, Inc.*, (referred to herein as *"Barr Labs I"*).[91] In *Barr Labs. I*, Barr, a generic drug manufacturer, sued Quantum, another generic drug manufacturer, after discovering that Quantum had filed false abbreviated new drug applications ("ANDA"s) with the FDA in order to obtain approval to market generic drugs. The FDA had found that certain statements and omissions which Quantum had made to the FDA regarding production and testing of lots used in support of an application for FDA approval were untrue which raised questions as to the reliability of Quantum's data.[92] Barr alleged that Quantum had violated the Lanham Act "when Quantum affixed labels with false descriptions and representations of its generic drugs,"[93] and by "falsely advertising that Quantum's generic drugs were the bioequivalent of, and contained similar therapeutic benefits as, the innovator drug and the generic drugs of other manufacturers, including Barr's products."[94] The district court held that Barr had inadequately pleaded its Lanham Act claim. The court noted that neither the FDA, nor Barr, had found that Quantum's drugs were not bioequivalent to the innovator drug as Quantum had represented. Finding that the complaint contained "broad and conclusory allegations" that Quantum falsely represented the therapeutic value of its generic drugs but (a) did "not specify what falsehoods or misrepresentations, if any, were contained" in the promotional information, (b) did not allege "any facts demonstrating that Quantum included false bioequivalence data in the ANDA's that were submitted to the FDA," and (c) did not allege that "the drugs were not the bioequivalent of the respective innovator drugs", the district court, in a decision dated July 7, 1993, dismissed the Lanham Act false advertising claims without prejudice to re-pleading.[95] Barr was provided 30 days to re-plead.[96]

89. *Id.*

90. *Id.*

91. 827 F.Supp. 111 (E.D.N.Y.1993).

92. *Id.* at 118.

93. *Id.* at 113.

94. *Id.* at 116–17.

95. *Id.* at 118.

96. *Eli Lilly* also cited approvingly the unpublished decision in *Barr Labs., Inc v. Quantum Mechanics, Inc.*, No 90 Civ. 4406, 1994 WL 1743983, 1994 U.S. Dist. LEXIS 2197 (E.D.N.Y. Feb. 2, 1994) (referred to herein as *"Barr Labs II"*), in which the district court, relying in part on *Mylan*, dismissed Barr's amended complaint filed after the July 7, 1993 published decision discussed in the text above. Barr's amended pleading alleged that Quantum's use of compendium names on the labels of its drug products and its descriptions of its drug products as "generic" and "bioequivalent" as well as "dependable alternative" to "brand-name products" "carr[ied] an informational load that includes assurances of the manufacturer's compliance with FDA approval procedures to establish the bioequivalency of the drug products." *Id.*, 1994 WL 1743983 at *8 and *10, 1994 U.S. Dist. LEXIS 2197, *26 and 33. Citing *Mylan*, the district court dismissed the Lanham Act claims for failure to state a claim. The court found it significant that Barr had not pleaded " 'any facts demonstrating that Quantum's generic drugs did not contain the active ingredients of the innovator drugs' " (*Id.*, 1994 WL 1743983 at *8, 1994 U.S. Dist. LEXIS 2197, *28; citation omitted) or that "Quantum's drugs are not bioequivalent to the innovator drugs" (*Id.*,

■ In sum, courts have held not only that a plaintiff may not seek to enforce directly the FDCA through the Lanham Act but also that a plaintiff may not maintain a Lanham Act claim if the claim requires direct application or interpretation of the FDCA or FDA regulations. "[S]uch a claim would allow a private litigant to interfere with the FDA's own investigatory time-table and prosecutorial decision-making ... [and] ...would force the Court to rule directly 'on the legality of ... conduct before the FDA has had a chance to do so.'" [97] The court should not "determine presumptively how a federal agency will interpret and enforce its own regulations." [98] To do so would violate Congressional intent that the FDA have discretion to enforce the FDCA and implementing regulations. [99] Therefore, as in *Sandoz* and *Braintree* courts have declined to consider misbranding claims under the Lanham Act and, as in *Mylan, Eli Lilly* and *Summit I and Summit II*, courts have declined to consider Lanham Act claims that, in essence, are false implications that a drug has FDA approval. But, as in *Mylan, Grove Fresh I*, and *Summit*, some courts have held that certain false statements are actionable under the Lanham Act "even if their truth may be generally within the purview of the FDA" [100] so long as the representation "is in commercial advertising or promotion" and "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods." [101] There is no single,

---

1994 WL 1743983 at *10, 1994 U.S. Dist. LEXIS 2197, *32). The amended complaint was dismissed under the reasoning of *Mylan* that implications of compliance with the FDA approval process would be FDCA violations for the FDA. The district court also found that "Barr's alleged injury is speculative at best;" because Quantum was not marketing its drug as generic to Barr's drug (which was another generic and was not the innovator drug), therefore "even assuming Quantum had not entered the market, it was equally probable that Quantum's customers would have purchased a generic drug manufactured by one of Barr's competitors, rather than Barr's product." *Id.*, 1994 WL 1743983 at *1, 1994 U.S. Dist. LEXIS 2197, *2–3.

Finally, *Eli Lilly* cited a second unpublished decision, *Barr Labs., Inc. v. Bolar Pharm. Co.*, 91 Civ. 4374 (D.N.J. July 13, 1992) (*"Bolar"*), which, although decided before *Mylan*, the *Eli Lilly* court found to be consistent with *Mylan* and *Barr Labs I*. *Bolar* was also discussed in *Barr Lab II* (which read the case as "reach[ing] the opposite conclusion reached by the court in *Mylan*"; 1994 WL 1743983, *10, 1994 U.S. Dist. LEXIS 2197 at *35). In *Bolar*, the court held that use of the term "generic," representation that "its drug products were *bona fide* generic substitutes," and "explicit" advertisements that "boasted 'the same high quality' as brand name drugs" in comparisons between the generic drug and the brand name drug stated a valid Lanham Act cause of action. 23 F.Supp.2d at 480 n.

29 and 1994 WL 1743983, **9–10, 1994 U.S. Dist. LEXIS 2197 at *34–35.

**97.** 933 F.Supp. at 932 (quoting *Summit I*, 922 F.Supp. at 306).

**98.** *Id.* (quoting *Sandoz*, 902 F.2d at 223) (citations omitted). *See Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 490 (D.C.Cir.1996) (Lanham Act cannot be used as "back-door method" of interpreting and enforcing administrative regulations).

**99.** *U.S. v. Goodman*, 486 F.2d 847, 855 (7th Cir.1973).

**100.** 933 F.Supp. at 933.

**101.** 15 U.S.C. § 1125(a)(1)(B). For example, in *Rhone–Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511 (8th Cir.1996), the Eighth Circuit affirmed the portion of a district court's decision that found that a drug manufacturer had falsely advertised that its product could be freely substituted for a competitor's product. In brief, Rhone–Poulenc Rorer's ("RPR") advertisements had featured images, such as two similar gasoline pumps, with dramatically different prices, accompanied by the slogan "which one would you choose." The Court of Appeals affirmed the district court's decision that such advertisements "falsely represented that the two drugs may be indiscriminately substituted," an "implicit message that was

bright-line test to distinguish sustainable from non-sustainable claims.

### 2. Application of Analytical Framework to the Factual Allegations

■ In this case, as summarized above, Healthpoint seeks a preliminary injunction in part because Kovia as a "misbranded and adulterated drug" based on allegedly low or varying levels of papain.[102] Correspondingly, Stratus seeks preliminary injunctive relief "due to the dual labeling problem" of Accuzyme based on the undisputed fact that Accuzyme being placed on the market today contains $8.3 \times 10^5$ USP units of papain activity as measured by USP lot G whereas Accuzyme used to contain $1.1 \times 10^6$ USP units of papain activity as measured by USP lot F.[103] Such claims based on alleged mislabeling are, in essence, misbranding claims which should be decided by the FDA. Therefore, the Court declines to consider awarding preliminary injunctive relief based on claims or arguments that Stratus incorrectly labeled or misbranded Kovia or that Healthpoint incorrectly labeled or misbranded Accuzyme. Similarly, the Court declines to consider awarding preliminary injunctive relief based on the argument that Kovia's alleged low or varying level of papain render it adulterated. Claims of adulteration should be resolved by the FDA.

Similarly, arguments concerning what federal law does or does not require for Kovia, Ziox, Accuzyme and Panafil White to be marketed legally require the direct application and interpretation of FDA regulations. The record reflects that Panafil White and Accuzyme have been on the market for years, that Kovia and Ziox have been marketed for more than one year, that the FDA has inspected the manufacturing operations for Accuzyme, Kovia and Ziox and that the FDA has an open investigation regarding Accuzyme, Kovia and Ziox. These and other facts show that the FDA is aware that the four ointments are on the market yet there is no proof that the FDA has taken any enforcement action against any of the four ointments to remove from the market. It is for the FDA to exercise its discretion to determine whether Accuzyme, Panafil White, Kovia and Ziox are on the market lawfully, whether it be because they are grandfathered or are exempt from the FDA preclearance process.[104] Resolution of these questions in court would require the "di-

---

literally false," because RPR's drug had been classified by the FDA as "BC" rather than "AB," meaning that the drugs were not necessarily bioequivalent and could only be substituted by a physician. 93 F.3d at 513 and 516. The Court of Appeals also affirmed the trial court's decision that Marion Merrell Dow ("MMD") early ads that claimed RPR's product had only 75% or 50% of the bioavailability of MMD's product violated the Lanham Act but that later ads that reported the results of a comparative study that showed a 81%–74% bioavailability were not false and did not violate the Lanham Act. 93 F.3d at 513–14.

**102.** Docket no. 17 at 13.

**103.** Docket no. 70 at 2. Stratus does not appear to seek a preliminary injunction based on a claim that the label of Accuzyme, as

currently marketed and as itself considered to be a representation about Accuzyme, is false. To the extent such an argument may have been presented, Stratus has not established a likelihood of succeeding on the merits of showing that there is a causal connection between the alleged mislabeling and any loss of sales or good will, a necessary element of a Lanham Act false advertising claim. Stratus has not produced any evidence that shows anyone prescribed or dispensed Accuzyme based on its label claim of papain or that Kovia—which apparently has exclusively been marketed as an alternative to Accuzyme—was deprived of a single substitution based on Accuzyme's label claim of papain.

**104.** 21 U.S.C. § 336; *Heckler v. Chaney,* 470 U.S. 821, 835, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

rect interpretation and application of the FDCA ... [which] ... are more appropriately addressed by the FDA, especially in light of Congress's intention to repose in that body the task of enforcing the FDCA." [105] As in *Summit I and Summit II*, were this court to decide the lawfulness of the marketing of the four ointments at issue, the decision improperly would " 'determine preemptively how a federal agency will interpret and enforce its own regulations.' " [106]

Other underlying, significant questions—such as whether Accuzyme, Panafil White, Kovia or Ziox should be required to file a new drug application ("NDA") or ANDA; whether the allegedly low or varying levels of papain in Kovia indicates that Stratus fails to comply with good manufacturing practices; [107] or whether Kovia would not work as well as Accuzyme; [108] whether Kovia or Ziox are inferior to and less effective than Accuzyme or Panafil White; [109] whether Kovia requires an FDA approval or rating; [110] whether Healthpoint must change Accuzyme's NDC number now that Accuzyme's label has changed; [111] and whether Kovia is danger-

ous or unsafe [112]—are enforcement issues which are committed to the FDA and are better suited for resolution by the FDA. The Court should decline to address them.

Notwithstanding the decision to defer to the FDA to resolve these threshold claims, the Court also must decide whether other claims at the heart of this lawsuit may be addressed in federal court or should be deferred to the FDA. Apart from allegations which the Court holds are matters for the FDA, Healthpoint argues in its post-hearing brief that it is entitled to a preliminary injunction based on the following alleged false or misleading representations that Stratus allegedly has made to the pharmaceutical trade: [113]

Kovia is "generic" or a "generic alternative" to Accuzyme; [114]

Ziox is "generic" or a "generic alternative" to Panafil White; [115]

Compare Kovia, a "branded generic" or "brand name" with "generic" price, to Accuzyme; [116]

Compare Ziox, a "branded generic" to Panafil White; [117]

Kovia is "bioequivalent" to Accuzyme; [118]

---

**105.** *Braintree Laboratories, Inc. v. Nephro–Tech, Inc.*, 1997 WL 94237 at * 6 (D.Kan. 1997). *See also Ciba Corp. v. Weinberger*, 412 U.S. 640, 644, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Rutherford v. U.S.*, 806 F.2d 1455, 1461 (10th Cir.1986); *North Am. Pharmcal, Inc. v. Dept. of HEW*, 491 F.2d 546, 549 (8th Cir.1973).

**106.** *Summit II*, 933 F.Supp. at 933 (quoting *Sandoz*, 902 F.2d at 223) (citations omitted).

**107.** Docket no. 17 at 16. Sonar Products, Inc. manufactures Kovia and Ziox for Stratus.

**108.** Docket no. 17 at 10.

**109.** Docket no. 17 at 9.

**110.** Docket no. 70 at 2.

**111.** *Id.*

**112.** *Id.*

**113.** Docket no. 159 at 2. To the extent that Healthpoint does not list certain allegations as false statements actionable under the Lanham Act (or common law), it appears to concede that the issues discussed above in this Order are matters within the primary jurisdiction of the FDA. This list is a summary of those matters discussed in greater detail in the text beginning at note 47, above.

**114.** PE 65, PE 71F, PE 74 and PE 76,

**115.** PE 71F and PE 74.

**116.** PE 36B, PE 48, PE 69, PE 71D, PE 76 and PE 111.

**117.** PE 36B, PE 49, PE 69 and PE 76.

**118.** PE 127; docket no. 17 at 16 and docket no. 12 at 1.

Kovia is "equivalent" to Accuzyme;[119]

Ziox is "equivalent" to Panafil;[120]

Kovia has the "same ingredients" or "same active ingredients" as Accuzyme;[121]

Ziox has the "same ingredients" or "same active ingredients" as Panafil;[122]

Kovia has "similar clinical effects" as Accuzyme;[123] and

Kovia and Ziox are "economical" and "high quality" alternatives to Accuzyme and Panafil.[124]

Healthpoint argues that "Stratus cannot seriously dispute that the last seven of the eleven representations, which concern the comparative qualities of and characteristics of Stratus's ointments are actionable under the Lanham Act and common law" and the first four representations are actionable, even though they "impl[y] that the ointments are FDA approved" because "under the facts of this case, these claims are positively false statements in advertising that harmed Healthpoint's commercial interests, and are not merely nonactiona-ble implications that Stratus has violated the FDCA by fraudulently obtaining FDA approval."[125] Healthpoint's motion argues that such claims falsely imply Stratus "has obtained FDA approval for Kovia"[126] and Ziox and induces pharmacists to conclude that Kovia may be substituted for Accuzyme and Ziox may be substituted for Panafil White. Healthpoint argues that because Stratus has not demonstrated that Kovia and Ziox are "therapeutically equivalent" or "pharmaceutically equivalent" or "bioequivalent" to Accuzyme and Panafil White, respectively, Stratus should not be allowed to suggest that Kovia and Ziox are freely substitutable, under most state laws, as a "generically" equivalent product.[127] Healthpoint acknowledges that Stratus may market and advertise Kovia and Ziox, unless and until the FDA should initiate action to remove them from the market,[128] and may work to encourage physicians to write prescriptions for either Stratus ointment, but may not place comparative advertisements that falsely suggest that either of Stratus' two ointments may be substituted as an equivalent for the corresponding Healthpoint product.[129]

119. PE 68 and PE 82.

120. PE 91.

121. PE 71D and PE 73.

122. PE 71D and PE 73.

123. PE 75; *see also* PE 29.

124. PE 29 and PE 73.

125. Docket no. 159 at 2 and 3. Stratus' post-hearing brief makes it clear that Stratus does contest all grounds. Docket no. 167.

126. Docket no. 17 at 16.

127. Docket no. 159 at 3.

128. As noted, Healthpoint has claimed that Kovia's papain levels affect its effectiveness; but, no such claim of quality, safety or effectiveness has been made against Ziox in connection with the preliminary injunction record.

129. Healthpoint argues that most states require therapeutic equivalence or bioequivalence before a drug may be substituted. In Texas, §§ 562.001(1), 562.002, 562.003, 562.009 and 562.012, TEX. OCCUPATIONS CODE (West, 2000), allow a pharmacist to substitute a "generically equivalent" drug, that is, "a drug that is pharmaceutically equivalent and therapeutically equivalent to the drug prescribed." "Pharmaceutical equivalence" is defined as "identical amounts of same active chemical ingredients in same dosage form and that meet the identical ... standards of strength, quality and purity according to the [USP] or other nationally recognized compendium." "Therapeutic equivalence" is defined, in essence, as bioequivalence. In Texas, it "is the professional responsibility of the pharmacists" to determine if a drug may be substituted for another, 22 TEX. ADMIN. CODE § 309.7(a). In Texas, a pharmacist needs a practitioner's consent to substitute a drug with different amounts of active ingredients.

In turn, apart from the allegations which this Court holds are matters for the FDA, Stratus seeks a preliminary injunction based on the following alleged false or misleading representations that Healthpoint allegedly has made: [130]

Kovia is not an alternative to Accuzyme;

It is illegal or otherwise in violation of federal or state law to prescribe, dispense or administer Kovia in place of Accuzyme;

Kovia is not an alternative to Accuzyme because it is not "AB" or "A" rated;

Accuzyme has been approved by the FDA;

Stratus puts out inferior drugs; [131] and

There are no generic equivalents to Accuzyme.

Stratus argues that if it must provide evidence in Court to demonstrate that Kovia or Ziox is a "generic" or "equivalent" to Accuzyme or Panafil White in order to show it may correctly suggest substitution, the Court, in effect, would be overruling the "undetermined status" that both Kovia and Ziox apparently enjoy, would be requiring the submission of evidence the

FDA has not sought from Stratus, and would be interfering with the FDA's primary jurisdiction. Stratus argues that it should be free to market Kovia and Ziox as "alternatives" to and "substitutes" for Accuzyme and Panafil White, leaving it up to licensed pharmacists and practitioners to determine if substitution is proper under state law and based on patient needs. Stratus argues that a reference to "generic" could not mislead in Texas because Texas is an "Orange Book state" such that a drug not listed in the Orange Book may not be substituted.[132]

As a threshold matter, it seems clear that in addressing claims of "generic," "equivalent to" or "alternative to," the Court should not change the FDA's definitions of such related terms of art as "pharmaceutical equivalents," "therapeutic equivalents," "bioequivalence" [133] and "pharmaceutical alternative." [134] New definitions of FDA terms would undercut national uniformity regarding federal laws regulating the drug market or would confuse the public and undermine confidence in the drug supply in general and generic drugs in specific.[135] Stratus has argued

---

**130.** This list is a summary of those matters discussed in greater detail in the text beginning at note 57, above.

**131.** Whether Kovia and Ziox are safe, effective, inferior or superior to Accuzyme and Panafil White are matters to be decided by the FDA. The portion of the claim that remains for further review by the Court is akin to a disparagement claim against Stratus.

**132.** Docket no. 34 at 7.

**133.** *U.S. v. 50 Boxes, More or Less*, 909 F.2d 24, 25 (1st Cir.1990) (terms in the FDCA do not carry their "ordinary English-language meanings"). *See also U.S. v. 225 Cartons, More or Less*, 871 F.2d 409, 413 (3rd Cir. 1989) ("General recognition in this context is a term of art").

**134.** PE 36D; 21 U.S.C. § 320.1.

**135.** The FDA's amicus brief in *Florida Breckenridge, Inc. v. Solvay Pharms., Inc.*, empha-

sized the need for a consistent determination of generic equivalence:

> Nor is there any room in federal law for a standard that defines generic equivalence in a manner inconsistent with the FDA's therapeutic equivalence standard. The statutory requirement of bioequivalence is an essential component of that standard and is a bulwark in the system of drug preclearance regulations designed to ensure the safety and efficacy of drugs on the market today. The district court's decision [referring to chemical equivalence] could undermine the FDA's ongoing efforts to protect the public from untested and unapproved drugs sold in violation of federal law.

PE 13, FDA amicus brief, at 10–11. *See also* docket no. 34 at tab 2 (excerpt from 1999 FDA publication) including a discussion captioned "FDA ensures equivalency of generic drugs."

The expression of the FDA's position in such matters as the *Solvay* brief, FDA publica-

that the "drug industry" has a different definition of "generic" than that proposed by the FDA.[136] Just as both Healthpoint and Stratus are "at risk" by marketing wound care ointments which are in an "undetermined status" with the FDA, it would appear that a drug manufacturer is at risk if it uses terms of art such as "generic" or "bioequivalent" when promoting a drug to mean something other than what the FDA requires. It is undisputed that health care professionals make drug substitution decisions based on determinations of pharmaceutical equivalence, therapeutic equivalence and/or bioequivalence (depending on the provisions of the applicable state's law)—factors discussed in the FDA's regulations, the Orange Book, and encompassed by CDER's definition of "generic." As urged by the FDA in its amicus brief in Solvay, to allow a drug manufacturer to use the word "generic" to mean something different for unapproved and approved drugs will confuse the consumer.[137]

■ Although the undersigned might agree, as argued by Healthpoint, that the false implication that a product has been approved could be as damaging as an express false claim of approval,[138] as noted above, courts have held that false implications of FDA approval—as opposed to direct statements that a product was approved when it was not—are not actionable. As in Mylan, Eli Lilly and Summit II, to the extent that Healthpoint alleges that Stratus' use of "informationally loaded" terms such as "generic" or "generic equivalent" implies FDA approval, the claims are not actionable and should be dismissed. The decision of whether Kovia is the "generic alternative" or "generic equivalent" or "bioequivalent" to Accuzyme and whether Ziox is the "generic alternative" or " generic equivalent" of Panafil White should be made by the FDA.[139] "[T]he task of identifying in the first instance whether one drug is the generic equivalent of another" belongs to the FDA, "the government agency with extensive technical and scientific expertise in the area." [140]

tions, and warning and opinion letters is "entitled to respect" to the extent it addresses the FDA's interpretation of the regulation of a "generic" equivalent to an unapproved (exempt) pioneer drug and, especially, as to the need for a uniform definition of such terms as "generic." *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

**136.** PE 121; *see also* DE 48 at 12 (Morgan deposition excepts) (First Data Bank has multiple definitions of "generics").

**137.** Healthpoint has referred to Accuzyme as a "therapeutic alternative" to Elase. DE 37.

**138.** Docket no. 159 at 9–10.

**139.** It should be noted that if Kovia is not "equivalent to" Accuzyme and if Ziox is not "equivalent to" Panafil White, neither Kovia nor Ziox would be entitled to the same exemptions from pre-approval as Accuzyme and Panafil White. It is undisputed that Stratus does not have tests of Kovia sufficient to meet FDA standards to show safety and efficacy

and has no tests at all of Ziox. Therefore, the similarity of Stratus' two products to Accuzyme appears to be of heightened importance to a finding that Kovia and Ziox enjoy the same "undetermined status" as Accuzyme and Panafil White.

**140.** PE 13 at 21 (citation omitted). Although it has been argued that "generic" has not been defined by statute, the Office of Generic Drugs' definition (PE 4) and the Orange Book's coding system which provides determinations of "therapeutic equivalence" to be used in making substitution decisions, bioequivalence and therapeutic equivalence are required for an FDA determination a drug is a "generic" equivalent. In *Solvay*, the FDA argued for implementation of an unvarying definition of "generic" in reference to the two unapproved drugs which were the subject of that case (PE 13 at 8).

Kovia is based on Accuzyme and Ziox is based on Panafil White. Because there is no evidence that Accuzyme or Panafil White have been approved as new drugs by the FDA, Kovia cannot be "generic" of Accuzyme and

Therefore, the Court declines to address any of the remaining claims to the extent they imply FDA approval.

■ But, the undersigned does conclude that a drug manufacturer making a claim that a non-approved drug is "generic" to or a "generic equivalent" of another non-approved drug must use the FDA's definition of "generic" and, when such a representation is challenged, as here, through a Lanham Act false advertising claim with specific allegations that the use of the terms is false and unsubstantiated, must defend and be prepared to demonstrate why it stated that its drug is a "generic equivalent," that is, is "identical or bioequivalent to a brand name drug in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use." [141]

As in *Mylan* and unlike *Eli Lilly*,[142] Healthpoint has alleged that Stratus has made false representation that two of its products were "bioequivalent" or "generically equivalent" or a "generic alterna-tive" to two respective Healthpoint products. The primary jurisdiction of the FDA would not appear to bar a court from deciding Healthpoint's false advertising claim that Stratus has made false claims of "generic equivalence" or "bioequivalence" and has allegedly falsely represented that Kovia and Ziox have the "same ingredients" or the "same active ingredients." There is a distinction, on the one hand, between respecting the FDA's primary jurisdiction to determine in the first instance whether a drug is lawfully marketed, "generic," "bioequivalent," "therapeutically equivalent," "pharmaceutically equivalent" and, on the other hand, a Lanham Act claim that a false statement has been made about a product.[143] Even though the FDA has not required Stratus to demonstrate the equivalence of Kovia to Accuzyme or the equivalence of Ziox to Panafil White, Stratus is not free to make false or misleading statements about its product.[144] To hold to the contrary would mean that an administrative scheme could eviscerate a Lanham Act or related com-

Ziox cannot be "generic" of Panafil White within the technical meaning of the FDA policy. PE 13 and PE 4 at 1 ("A generic drug is identical or bioequivalent to a brand name drug in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.... Drug companies must submit an abbreviated new drug application (ANDA) for approval to market a generic product.").

**141.** PE 4 at 1. Stratus concedes that it has no tests adequate to show the therapeutic equivalence, bioequivalence or bioavailability of Kovia and Ziox to Accuzyme and Panafil White (docket no. 167 at 4).

**142.** The court in *Eli Lilly & Co.* found that, as in *Barr Labs. II*, "Lilly has not alleged that defendants made false representations as to the quality, bioequivalency or safety of its products" such as "Quantum's drugs were not bioequivalent to the innovator drug." 23 F.Supp.2d at 478. Unlike *Eli Lilly* in which the district court concluded that "[t]he Lanham Act does not provide a right of action with respect to implied representations that defendants obtained FDA approval" (23

F.Supp.2d at 479–80), Healthpoint has alleged that Stratus has made false representations as to the generic equivalence and bioequivalence of Kovia to Accuzyme and generic equivalence and equivalence of Ziox to Panafil. Healthpoint has not merely alleged "that certain terms and phrases carry an informational load," but also has alleged "positively" a false statement.

**143.** The term "alternative" is less problematic, perhaps because "alternative" does not imply identity or equivalence. *C.f., In re Genentech, Inc. Securities Litig.*, 1989 WL 106834 *2 (N.D.Cal.) ("If primary jurisdiction of the FDA were appropriate whenever an action presented complex medical and pharmacological issues, the FDA would virtually have no time to regulate drugs. The agency would be required to pass on such issues in all drug patent litigation, product liability litigation and all other litigation, which is by no means *de minimis*, in which such issues are raised.").

**144.** As a policy matter, Stratus has advanced no reason why the FDA would require "com-

mon law claim over which the agency has no jurisdiction. For example, if Stratus represents that its two ointments are "bioequivalent," "generically equivalent," "equivalent" or have "the same active ingredients" or "the same ingredients" or "the same active ingredients in the same amounts,"[145] consumer and competitors have a right to expect that such representations have factual support and the Lanham Act provides a vehicle to enforce that expectation. Conversely, the FDA's primary jurisdiction also should not bar the Court from deciding Stratus' claim that Healthpoint made false or misleading statements about Kovia and Ziox (*e.g.*, the Stratus products lack a needed FDA approval or rating). These claims are not merely claims that a drug falsely implied it has been approved by the FDA without any additional allegation of falsity; rather,

each is a claim of false or misleading comparisons between two specific products in the context of comparative advertising and promotion relating to whether one drug can be substituted for another under state law.[146]

In sum, issues that require direct application or interpretation of the FDCA or its implementing regulations or FDA policies should not be addressed by the Court; neither Healthpoint nor Stratus has demonstrated likelihood of succeeding on the merits on any issue that requires the Court to directly apply or interpret the FDCA, implementing regulations or FDA policies.[147] On the other hand, at this stage of the pleading, it appears that other issues are able to be resolved without the direct application or interpretation of the FDCA, implementing regulations or FDA policies.[148] Whether or not either side has

parability or superiority" claims to be "demonstrated by substantial evidence or substantial clinical experience" when dealing with pre-approved drugs (PE 12 at A–109; *see also* PE 3), but allow exempt drugs to be comparatively marketed with no factual support. *See* PE 5, PE 6, PE 7 and PE 8 (FDA advisories or warning letters sent to makers of non-approved drugs demanding that they cease making claims that a drug is "interchangeable" with or a "substitute" for or "can be used in place of" another drug, since such claims imply equivalence but the FDA has not determined equivalence or interchangeability).

145. Docket no. 69 at 5–6.

146. *Mylan Labs.*, 7 F.3d at 1138 (false claims of bioequivalence, generic equivalence and entitlement to an AB rating were actionable under the Lanham Act when Mylan alleged that the bioequivalence studies had been "falsified" or was seriously "unreliable"); *Rhone–Poulenc Rorer Pharms., Inc.*, 93 F.3d at 513 and 516 (two approved drugs could not be advertised to suggest indiscriminate substitution when the FDA had not found bioequivalence but had classified the generic as "BC" rather than "AB"); *Eli Lilly*, 23 F.Supp.2d at 479 n. 29 ("*Bolar* is consistent with *Mylan* ... because it upheld a Lanham Act claim where defendant misrepresented a

comparison between a generic drug and the brand name drug.").

147. These claims include whether: Kovia is a "misbranded and adulterated drug" based on the varying or low amounts of papain; Accuzyme is mislabeled or misbranded; Accuzyme, Panafil White, Kovia and Ziox are marketed lawfully without express FDA approval; Stratus has arranged for Kovia to be manufactured in accordance with good manufacturing standards; Kovia works as well as Accuzyme; Kovia and Ziox are inferior to or less effective than Accuzyme and Panafil White, respectively; Kovia (and Ziox) are unsafe; Kovia (and Ziox) need an FDA approval or rating; Kovia (or Ziox) are dangerous or unsafe Healthpoint must change Accuzyme's NDC number; Kovia and Ziox are "generic" or "generic alternatives" to Accuzyme and Panafil White, respectively; whether Kovia is "bioequivalent" to Accuzyme; whether Kovia is not an alternative to Accuzyme because it is not AB or A rated; and whether Kovia's ranges for urea and papain are within the USP acceptable range of 90 % to 110%.

148. The FDA's decision on matters within its primary jurisdiction could not moot some or all of the remaining claims.

demonstrated a likelihood of success on any of those issues is addressed below.

## C. Unclean Hands and Lawfulness of the Marketing

Stratus has argued that Accuzyme and Panafil White are not marketed legally and, therefore, Healthpoint should not be entitled to receive relief from the court.[149] Stratus concedes that it created Kovia and Ziox by duplicating the label claims of Accuzyme and Panafil White and concedes that if Accuzyme and Panafil White are not marketed legally then neither are Kovia and Ziox. Stratus argues that the Court should decline to consider any claim in this lawsuit, deferring all claims to the FDA.

### 1. Unclean Hands

██ The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."[150] Although equity does not demand that the parties "have led blameless lives ... it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue."[151] For the doctrine to apply, a party's conduct does not need to be one punishable as a crime or one that would justify legal proceedings of any sort.[152] "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause" for the court to invoke the doctrine.[153] The wrongful acts upon which the claim of unclean hands is premised must "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication."[154] Plaintiff's alleged wrongdoing will not bar relief unless the defendant establishes personal injury resulting from plaintiff's conduct.[155] The unclean hands doctrine "does not purport to search out or deal with the general moral attributes or standing of a litigant."[156]

██ The doctrine of unclean applies to preliminary injunctions[157] and affords the equity court broad discretion in rejecting an unclean litigant's claims.[158] However, the doctrine should "not be used as a loose cannon, depriving plaintiff of an equitable remedy ... merely because he is guilty of unrelated misconduct."[159] In ap-

---

149. E.g., docket no. 68.

150. Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). The Supreme Court held that dismissal of Automotive's claims for patent infringement and breach of contract was proper because Automotive knew the application for patent rights was fraudulent and infected with perjury. Id. at 819, 65 S.Ct. 993.

151. Id. at 814–15, 65 S.Ct. 993 (citations omitted).

152. Id. at 815, 65 S.Ct. 993.

153. Id.

154. Mitchell Bros. Film Group v. Cinema Adult Theater, 604 F.2d 852, 863 (5th Cir. 1979) (quoting Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933) and holding

that unclean hands doctrine based on claim that public was harmed by plaintiff's production of obscene materials would not bar plaintiff's copyright infringement claim because the alleged wrongful conduct did not change equities between parties and defendant was not harmed), cert. denied, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980).

155. Id.

156. Id.

157. American Hosp. Supply Corp. v. Hospital Prod. Ltd., 780 F.2d 589, 601 (7th Cir.1986).

158. Precision Instrument, 324 U.S. at 815, 65 S.Ct. 993.

159. American Hosp., 780 F.2d at 601 (refusing to find unclean hands because plaintiff's false advertising was unrelated to alleged breach of contract).

plying, the unclean hands doctrine, the court must consider the situation as it existed at the time of the suit.[160]

 Equity denies relief "where the plaintiff is misrepresenting to the public the nature of his product either by the trademark itself or by his label."[161] Unclean hands is a defense to a Lanham Act claims such as trademark infringement and unfair competition.[162] As the Supreme Court said in *Clinton E. Worden & Co. v. California Fig Syrup Co.:*[163]

> [W]hen the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not in his trade-mark, or in his advertisements and business, be himself guilty of any false or misleading representation; that if the plaintiff makes any material false statement in connection with the property which he seeks to protect,

he loses his right to claim the assistance of a court of equity; that where any symbol or label claimed as a trade-mark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained.[164]

Equity affords no protection to a party who is guilty of "materially false or misleading advertisements or business relative to the trademark."[165] A Lanham Act defendant must show that "plaintiff's conduct is inequitable and that the conduct relates to the subject matter of [plaintiff's] claims."[166] In a claim for false advertising, the unclean hands of the plaintiff must relate to the same product the defendant allegedly falsely advertised.[167] A court may reject the doctrine where the "failure to grant an injunction would only increase the damage inflicted on the buying public."[168] The unclean hands doctrine should not bar Lanham Act claims when the doc-

---

160. *Recamier Mfg. Co. v. Harriet Hubbard Ayer, Inc.*, 59 F.2d 802, 808 (S.D.N.Y.1932).

161. *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 494, 62 S.Ct. 402, 406, 86 L.Ed. 363 (1942) (petition for injunctive relief dismissed because patentee was using patent to restrain competition); *Strey v. Devine's*, 217 F.2d 187, 190 (7th Cir.1954) (dismissing cause of action because plaintiff was not licensed doctor as misrepresented on product label and that plaintiff did not properly list all ingredients as required by FDA).

162. *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 272 (5th Cir.1999) (citing *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997)) and (vacating and remanding preliminary injunction proceeding for determination of whether unclean hands barred plaintiff's Lanham Act claim of unfair competition).

163. 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282 (1903). The Court found that the doctrine of unclean hands barred trademark infringement claims where plaintiff's product, deceptively labeled as "Syrup of Figs," did not contain figs. *Id.* at 539, 23 S.Ct. 161. The Court noted whether or not the product initially contained figs was not justification for

continuing to use the description after fig juice was no longer a material ingredient. *Id.* at 536–37, 23 S.Ct. 161.

164. *Id.* at 528, 23 S.Ct. 161.

165. *Recamier Mfg.*, 59 F.2d at 808 (citations omitted) (refusing to apply unclean hands doctrine to false representations regarding other trademarks because they were not closely related to trademark at issue).

166. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir.1987) (quoted by *Sugar Busters*, 177 F.3d at 272) and (affirming district court's decision to not instruct jury on unclean hands because Fuddruckers' description of hamburger meat as "ground steak" was not major part of trade dress which was allegedly infringed).

167. *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 214 (D.D.C.1989) (citations omitted), *aff'd in part and rev'd in part on other grounds*, 913 F.2d 958 (1990).

168. *Id.* (refusing to apply equitable defenses where worst effects of both parties' advertising had been felt by public).

trine is premised on allegations of non-compliance with the FDCA because to do so would allow a mere accusation of an FDCA violation to bar Lanham Act relief but only the FDA has the power to decide if an FDCA violation has occurred.[169]

Courts have applied the doctrine of unclean hands to bar equitable relief in cases involving trademark infringement, false advertising, and unfair competition. In *Strey v. Devine*,[170] the Seventh Circuit found that plaintiff's use of the designation "Dr." on his product label, although plaintiff was not a licensed physician, could mislead the public into believing the product was prescribed by a doctor.[171] Additionally, the court found that under the FDCA, plaintiff's product was misbranded because the label did not list all ingredients. The Seventh Circuit affirmed the dismissal of plaintiff's claims for trademark infringement and unfair competition, finding the claims barred by unclean hands.

■■■ As noted, Stratus has argued that Healthpoint has unclean hands because Healthpoint *cannot* demonstrate that either Accuzyme or Panafil White are lawfully on the market. As an initial matter, Stratus' argument is not without problems. Stratus has readily argued that it is in the same position as Healthpoint and, as noted herein, is relying on the same compliance policy guide, CPG 7132c.02, in marketing Kovia and Ziox. Stratus has contended that it attempted to duplicate Accuzyme and Panafil White when creating Kova and Ziox, respectively, therefore, if the FDA should determine that Accuzyme and/or Panafil White are not marketed lawfully, Stratus would be required to withdraw

Kovia and Ziox as well. Further, the parties agree that administrative scheme applicable to Accuzyme, Panafil White, Kovia and Ziox provides that some drugs can be marketed without FDA pre-approval *unless* the FDA intervenes affirmatively to say otherwise. Accuzyme, based on Panafil White, has been openly marketed and reported to the FDA since 1996 without pre-approval and the FDA has taken no action against Accuzyme, even though the FDA visited the San Antonio plant in 2000 in a misbranding investigation. Under these circumstances, the Court cannot determine that Healthpoint has "unclean hands" or lacks standing due to it failure to have affirmative proof that pre-approval is not required.

### 2. *Marketing a Prescription Drug Without Prior FDA Approval*

The FDCA, first enacted in 1938 and subsequently amended, instituted pre-market clearance for new drugs before a drug may be sold in interstate commerce.[172] The FDCA defines "drug" broadly to include any article listed in the USP and any article intended to affect the structure or function of the human body.[173] The FDCA's pre-market clearance through an NDA is required for every drug unless it satisfies one of two general exceptions to the statutory definition of "new drug." A drug is a "new drug" *unless* (1) it has been "generally recognized, among [qualified] experts ... as safe and effective for the use under the conditions, prescribed, recommended, or suggested in the labeling thereof" ("GRAS/E") based on testing and investigations and use outside of the investigatory process;[174] or (2) it is grandfa-

**169.** *Inmuno Vital, Inc. v. Golden Sun, Inc.*, 49 F.Supp.2d 1344, 1359 (S.D.Fla.1997) (citations omitted).

**170.** 217 F.2d 187 (7th Cir.1954).

**171.** *Id.* at 189–90.

**172.** 21 U.S.C. § 355(a).

**173.** 21 U.S.C. § 321(g)(1).

**174.** 21 U.S.C. § 321(p)(1) and (2).

thered under the terms of either the 1938 provisions or 1962 amendments.[175]

After the Hatch–Waxman Act in 1984, a "generic drug" may be approved without a NDA (and the extensive studies) if it is "therapeutically equivalent" to a brand name or "pioneer" drug. In such cases, an ANDA is required and allows the generic drug manufacturer to demonstrate safety and efficacy by showing that the generic drug is "bioequivalent" to the pioneer drug that has already been approved as safe and effective,[176] and that the generic drug is a "pharmaceutical equivalent" to the pioneer drug, that is, the active ingredients are the same and the two drugs share the same strength, route of administration and dosage form.[177] Many states require the substitution of less expensive, therapeutically equivalent generic drugs when a brand name drug is prescribed. The "Orange Book" compiles the list of all drugs that the FDA had approved as safe and effective with "therapeutic equivalence determinations" for the generic versions of listed pioneer drugs.[178]

The FDA developed compliance policy guide ("CPG") 7132c.02 to address drug products that are on the market but have not received FDA approval for both safety and effectiveness.[179] These drugs fall into several different categories. Drugs that fall within part B of CPG 7132c.02 may be marketed pending a final determination by the FDA as to their lawfulness. According to Mr. Meyer's testimony, Accuzyme and Panafil White would fall within part B of CPG 7132c.02 because each meet the definition of being "a [prescription] drug product that contains one or more active ingredients first introduced into the marketplace before 1962" which is "marketed based on their manufacturer's belief that such products are not subject to the new drug provisions of the act ['FDCA as amended']."[180] Therefore, Mr. Meyer testified that Accuzyme and Panafil White— and Kovia and Ziox—are in an "undetermined status" with the FDA. The FDA must determine whether Accuzyme and Panafil White are GRAS/E or grandfathered or whether an NDA will be required and that there is an administrative scheme, with notice, opportunity to be heard and appellate rights, that will apply to the FDA's decision.[181] Pending that decision, the FDA, through CPG 7132c.02 has exercised its discretion to allow the

---

175. *Id. See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 613–15, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Florida Breckenridge, Inc. v. Solvay Pharms., Inc.*, 174 F.3d 1227, 1229 (11th Cir.1999), *withdrawn at the request of the court; U.S. v. Atropine Sulfate 1.0 mg. (Article of drug) Dey–Dose*, 843 F.2d 860, 861–62 (5th Cir.1988).

176. 21 U.S.C. § 355(j)(2)(A)(iv), (j)(4)(F).

177. 21 U.S.C. § 355(j)(2)(A)(iii); 21 C.F.R. § 320.21(c).

178. *See* 45 Fed.Reg. 72582 (Oct. 31, 1980); 33 Fed.Reg. 2932 (Jan. 12, 1979).

179. PE 28.

180. PE 28; PE 40 at 4–6; *see also* PE 1 at 3; and docket no. 155 at 1 (Mitchell counter designation) (Accuzyme is a "me too" product

to a pre–1962 drug). *U.S. v. Sage Pharm., Inc.*, 210 F.3d 475 (5th Cir.2000) (CPG 7132c.02 does not itself exempt any drug from FDA approval requirements but simply describes how the FDA exercises its enforcement discretion).

181. Mr. Meyer testified that if the FDA decided to initiate action, the manufacturer could withdraw the product, file an NDA or request a hearing to request an exception. The drug manufacturer has a right to a formal evidentiary hearing before an ALJ, followed by judicial review. Until all steps are exhausted, the status of the drug remains "undetermined" and the drug may continue to be lawfully marketed. *See* docket no. 85 at tab D (HCFA memorandum on DESI review policy).

ointments to be marketed, at least until they are removed from the market.

The pre-marketing legal opinion obtained by Stratus essentially agrees with Mr. Meyer's conclusions as to lawfulness. The law firm of McKenna and Cuneo, L.L.P. provided Stratus with an opinion letter dated June 26, 2000, regarding Kovia which concluded, in sum, that (a) Panafil White was on the FDA's "DESI II" list;[182] (b) "[u]ntil FDA takes action or makes a final determination, a similar version of the DESI II listed Panafil White formulation, which is identical in formulation, strength, dosage form, route of administration, indications for use, and intended patient population, may be marketed in accordance with CPG 7132c.02;" and (c) even though Kovia "is not absolutely identical to the DESI II listed formulation" of Panafil White, the "FDA is unlikely to take action against a product containing the formulation proposed by Stratus" that varies only as to the strength of papain activity, but otherwise has "a similar dosage form, route of administration, indication for use, and intended patient population ... [and] that there are not safety issues connected with the change in strength of the active ingredients."[183]

The parties do not dispute that Accuzyme, Panafil White, Kovia and Ziox are "drugs" within the meaning of the FDCA. There is no evidence that any of the four ointments has been the subject of a NDA or ANDA or that Stratus could file an ANDA based on Kovia and Ziox's purported equivalence to Accuzyme and Panafil White (because Accuzyme and Panafil White are not the subject of an approved NDA). The FDA has not taken action to remove Accuzyme or Panafil White from the market, even though both have been on the market for a number of years, or to remove Kovia and Ziox from the market. The record reflects that Healthpoint has reported its marketing of Accuzyme in its annual reports to the FDA, the FDA has an open investigation of misbranding of Accuzyme, the FDA recently inspected the San Antonio plant in connection with the investigation.[184] The record also shows that the FDA has inspected the manufacturing operation for Kovia and Ziox. It is clear the FDA has had and continues to have the opportunity to decide if further enforcement action is appropriate.[185] Stratus' arguments as to lawfulness advanced in connection with the preliminary injunction hearing are weaker, but, again, the FDA has had an open investigation regarding Stratus' marketing of Kovia and

---

**182.** The term "DESI II" is used to refer to prescription drugs marketed before 1962, or "me too copies" that were not the subject of NDAs. PE 1 at 3. McKenna and Cuneo attached to its opinion letter a copy of an FDA report that indicated that the FDA had identified Panafil White as a DESI II drug. PE 1 at attachment A. See also docket no. 85 at tab b–2 (DPT's Feb. 2, 2001 letter to the FDA stating that "the Accuzyme product was formulated from the pre–1962 DESI–2 product, Panafil White").

**183.** PE 1 at 5–6.

**184.** PE 40 at 5; docket no. 155 at 6 (Hobson counter designation).

**185.** Although the FDA's amicus brief in *Solvay* criticized the trial court for not applying the FDCA's "standards or the applicable regulatory requirements to determine the status of the drugs at issue here," a "crucial omission" (PE 13 at 16), the FDA also emphasized that a determination of the legal status of the drugs "should be made in the first instance by the FDA" (PE 13 at 15 n. 7) and [i]f there was any doubt ... the "court should have referred the matter to the FDA to exercise its 'peculiar expertise'" (PE 13 at 16 n. 7) (citation omitted). Unlike *Solvay,* there is no evidence that either Healthpoint or Stratus filed a drug application with the FDA that was rejected for any of the four ointments in question. Further, the FDA's amicus brief in *Solvay* did not address CPG 7132c.02.

Ziox and has not taken any enforcement action to remove it from the market.[186]

It is for the FDA to exercise its discretion to determine whether these four ointments are on the market lawfully, whether it be because they are grandfathered or otherwise qualify for any exception to the FDA pre-clearance process.[187] Resolution of these questions in court would require the "direct interpretation and application of the FDCA ... [which] ... are more appropriately addressed by the FDA, especially in light of Congress's intention to repose in that body the task of enforcing the FDCA."[188] As in *Summit I and Summit II*, the District Court should not "'determine preemptively how a federal agency will interpret and enforce its own regulations.'"[189]

Mr. Johnston, Stratus' expert, testified that, in his opinion, a drug is and should be considered to be "illegal" until it has been approved by the FDA, thereby supporting Stratus' arguments that Accuzyme and Panafil White—and Kovia and Ziox—are illegal. But, Mr. Johnston conceded that even if all four ointments should be considered to be "illegal" until determined by the FDA to be "legal," Stratus and Healthpoint are marketing the four ointments in question under the literal terms of an FDA policy guide through which the FDA has exercised its discretion to allow the four ointments to be marketed pending the FDA's determination of their status. Thus, even under Mr. Johnston's testimony, such "illegality" that does not bar the lawful marketing of the ointments (absent an FDA determination that the marketing must stop) would not amount to "unclean hands" to bar either party from obtaining judicial relief.[190]

### D. Entitlement to a Preliminary Injunction

A district court has broad discretion when ruling on requests for preliminary injunctions. When, as here, the requested preliminary relief would award movant substantially the relief it would obtain after a trial on the merits, the Court must be particularly deliberate when weighing the four prerequisites for injunctive relief.[191] The discussion will first address the Healthpoint's palming off claim as a basis for injunctive relief, then will address the

---

**186.** Docket no. 155 at 4 (Mitchell counter designation); *see also* DE 51 at tab 6.

**187.** 21 U.S.C. § 336; *Heckler v. Chaney,* 470 U.S. 821, 835, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

**188.** *Braintree Laboratories, Inc.,* 1997 WL 94237 at * 6. *See also Ciba Corp. v. Weinberger,* 412 U.S. 640, 644, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Rutherford v. U.S.,* 806 F.2d 1455, 1461 (10th Cir.1986); *North Am. Pharmcal, Inc. v. Dept. of HEW,* 491 F.2d 546, 549 (8th Cir.1973). See *Immuno Vital, Inc. v. Golden Sun, Inc.,* 49 F.Supp.2d 1344, 1359 (S.D.Fla.1997).

**189.** *Summit II,* 933 F.Supp. at 933 (quoting *Sandoz,* 902 F.2d at 232) (citations omitted).

**190.** As a legal matter, as discussed above, while it is proper to defer to the FDA to decide matters within its primary jurisdiction, there is no legal basis for declining to decide Lanham Act and related common law claims which do not require the Court to apply or construe FDA law, regulations or policy. As a practical matter, if this Court were to agree with Stratus and bar Healthpoint from obtaining any judicial relief because Healthpoint cannot affirmatively establish that Accuzyme and Panafil White are lawful—only that they are in an "undetermined" status, then there would be no judicial remedy for Lanham Act and other causes of action over which the FDA has no jurisdiction even though Stratus and Healthpoint would still be able to market the drugs under CPG 7132c.02 until the FDA acted.

**191.** *E.g., Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 485–86 (8th Cir.1993) (citations omitted).

elements of the parties' false advertising claims, and then will address the evidence as it relates to likelihood of success, and finally will address the other three elements for issuance of a preliminary injunction.

### 1. *Likelihood of Success on the Merits*

### a. false advertising

 Healthpoint moves for issuance of a preliminary injunction based on claims of false advertising and unfair competition in violation of § 1125 of the Lanham Act and the common law.[192] Stratus moves for issuance of a preliminary injunction based on its claim of false advertising under the Lanham Act.[193] The parties agree that in order to prove a claim of false advertising under the Lanham Act, a party must show the following elements:

(1) a false or misleading statement of fact about a product;

(2) a statement which actually deceived or had the capacity to deceive a substantial segment of potential consumers;

(3) a material deception in that it was likely to influence a consumer's purchasing decision;

(4) the product was in interstate commerce; and

(5) plaintiff had been or was likely to have been injured as a result of the statement in issue.[194]

When the statements of fact at issue are literally false, movant is not required to introduce evidence on the issue of the impact the statements had on consumers; the court will assume the statements actually misled consumers. But, if the statements are misleading, but either ambiguous or literally true, there is no such presumption. When a party seeks only injunctive relief, the party must show that the statements have a tendency to deceive consumers and must produce evidence that the advertisement tends to deceive consumers. When a party seeks to recover money damages for a misleading advertisement that is not literally false, the party must prove actual deception. This requires evidence that a substantial number of consumers were actually mislead by the advertisements.

### b. summary of findings and conclusions on likelihood of success

The following section summaries aspects of the testimony to provide additional findings and conclusions in connection with the cross motions for preliminary injunction. In several instances, witnesses testified for hours. The following section summarizes only those aspects of the testimony, not referred to elsewhere in this Order,

**192.** Docket no. 17 at 14 ("false advertising and unfair competition under state and federal laws"). Healthpoint's briefing does not demonstrate how the elements of its common law false advertising and state and federal unfair competition claims differ from its federal false advertising claim such that the analysis in this Order should differ.

At opening statement, Healthpoint also argued that Stratus' false representations that Kovia and Ziox are "generic" of and equivalent to the Healthpoint products induce or promote illegal substitution and constitute "palming off." Healthpoint's third amended complaint alleges a cause of action for com-

mon law "palming off" which is not a ground for issuance of a preliminary injunction discussed in Healthpoint's motion. Therefore, this Order addresses the argument and evidence regarding "palming off" in the context of Healthpoint's false advertising claims.

**193.** Docket no. 73 at 12 ("false advertising under the Lanham Act").

**194.** Docket no. 17 at 15; docket no. 73 at 12. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir.2000); *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1383 n. 3 (5th Cir.1996); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir.1990).

deemed to be most central to the conclusions reached in this Order.

Philip Johnson, the chief operating officer of Leo J. Shapiro and Associates, testified as Healthpoint's first witness concerning a survey which his firm conducted for Healthpoint. Mr. Johnson's qualifications, the survey methodology, survey questions and results are summarized in his report which was received into evidence as plaintiff's exhibit 38. In brief, the survey was designed generally to "measure expectations the physicians who prescribe such wound care products have for the kind of substitute drug which a pharmacist might choose to fill a prescription written by the physician" and, specifically to study "the degree to which physicians who write the prescriptions for such wound care products believe that the drug which is substituted for the brand name drug will be the pharmaceutical equivalent of the one they specified."[195] One hundred wound care physicians affiliated with hospitals were randomly located and contacted through a list of all United States hospitals provided by a marketing systems group. The sample was geographically diverse throughout the United States. After the survey questions were answered, Mr. Johnson rad all the responses and classified the answers.

The results of the study showed, in sum, that: approximately 78 percent of the respondents allow substitution of a brand name product for at least one-half of the prescriptions they write;[196] approximately 80 to 90 percent of respondents, in the aggregate and in response to open-ended questions which allowed the respondents to use their own words, expect that the substituted product will be equivalent;[197] approximately 91 percent of the respondents specifically indicated that they expect the substituted product to be "the therapeutic equivalent of the band name drug" specified in the prescription;[198] and approximately 91 percent of the respondents, in the aggregate and in response to open ended questions which allowed them to use their own words, indicated that they expect the substituted product to be therapeutically equivalent.[199] Based on the survey, Mr. Johnson concluded that if "the pharmaceutical products Kovia and Ziox, which are being sold by Stratus as substitutes for Accuzyme and Panafil, are not the therapeutic equivalents of the Healthpoint products, [then the Stratus products] would not, therefore, be acceptable substitutes, based on wound care physician expectations when they write a prescription for such drugs as Accuzyme or Panafil."[200]

Mr. Gerald Meyer, currently a regulatory consultant to industries regulated by the FDA, testified as Healthpoint's second witness.[201] Mr. Meyer was employed by

---

195. PE 38 at 2.

196. PE 38 at 6.

197. PE 38 at 7.

198. PE 38 at 8.

199. PE 38 at 9.

200. PE 38 at 10.

201. Because Stratus' first witness, Mr. Gordon Johnston, testified out of turn as the first witness in the May 7 hearing, Mr. Meyer's testimony discussed expert opinions offered by Mr. Johnston regarding the legality of the ointments in question. For purposes of clari-

ty, this report first summarizes the testimony of Healthpoint's witnesses and then the testimony of Stratus' witnesses.

As noted above, Stratus made a *Daubert* objection for purposes of the trial to Mr. Meyer's testimony. Later, in the course of direct examination, Stratus objected to questions to Mr. Meyer regarding the range of potency of Accuzyme. Healthpoint proffered that the testimony was within the scope of the designation because it was offered solely in rebuttal to Stratus' proposed testimony on the subject and offered "out of turn" only so that Mr. Meyer could testify and be excused. The Court heard the testimony subject to connecting up by Stratus offering testimony or other

the FDA for approximately 23 to 24 years and retired as the acting director and deputy director of the FDA's Center for Drug Evaluation and Research ("CDER"). Mr. Meyer has approximately 40 years experience in FDA issues.[202]

Mr. Meyer testified that, in his "unqualified" expert opinion, Accuzyme is legally on the market.[203] Mr. Meyer noted that Healthpoint is duly registered with the FDA; Accuzyme has been listed with the FDA; Healthpoint has been inspected by the FDA and found to be in compliance with good manufacturing practice requirements. Mr. Meyer testified that drugs products that were introduced to the market between 1938 and 1962 and were reviewed for safety were later reviewed for effectiveness under the FDA's DESI program.[204] In conjunction with the DESI program, the FDA also decided on policies to be followed in reviewing other drugs that had not been reviewed by the FDA, such as pre–1938 drugs or drugs grandfathered under the 1938 or 1962 laws. FDA compliance policy guide ("CPG") 7132c.02 is the statement of FDA policy on how the FDA will review certain drug products. Mr. Meyer testified that there is "common agreement" that wound debridement products like Panafil, Accuzyme, Kovia and Ziox were products available on the market in the 1950's. Therefore, Mr. Meyer testified that Accuzyme is covered by part B of CPG 7132c.02 as a "drug product containing one or more active ingredients first introduced into the marketplace before 1962 .. not covered by an NDA ...[which is] ... marketed based on their manufacturer's belief that such products are not subject to the new drug provisions of the act." [205] In Mr. Meyer's expert opinion, and in disagreement with the opinion of Stratus' expert, Mr. Johnston, part B of CPG 7132c.02 provides that the status of Accuzyme is "undetermined" and that until a "final determination[ ] regarding their regulatory or legal status" has been made, Accuzyme may be marketed lawfully.[206]

Mr. Meyer also testified that he did "not believe that the FDA would ever seek a charge of 'misbranding' against Healthpoint" [207] because the mislabeling problem was due not to intent to deceive about Accuzyme's active ingredients but due to a change in the USP reference standard.[208] Because of these factors and there is no indication that patients were injured or at risk, Mr. Meyer believes that "[t]he corrective action FDA would have sought has been taken" when Healthpoint notified the FDA and potential consumers that it was changing its label and did change its label, its advertising, and the information in the PDR.[209]

Mr. Meyer also testified that although Accuzyme was marketed under an inaccurate label and misbranded and that the

---

evidence on the range of potency of Accuzyme. The Court indicated, without objection, that the testimony would be considered only in rebuttal and would not be considered if Stratus did not offer evidence on the topic. *See* docket no. 50 at 12–13 and 19 (Stratus' deposition designation of Hobson which touches upon stability and stability limits); and Stratus' cross-examination of Larry Anderson.

202. PE 39.

203. PE 40 at 4.

204. Mr Meyer testified that there may have been a dozen exceptions to the effectiveness review under DESI.

205. PE 40 at 5.

206. PE 40 at 6.

207. PE 40 at 6; *see* PE 40 at 6–8.

208. *See* PE 40 at 4–6.

209. PE 40 at 7–8.

FDA might order corrective action, he found that the misbranding in this case—a result of the USP reference standard changing—was unprecedented and would also be taken into consideration along with its determination of whether Healthpoint has taken corrective action to notify the consumer and to prevent a recurrence of the problem. Although Mr. Meyer was careful to defer to the FDA and its determination of what action should be taken, if any, because there is no evidence of risk to patients, he doubted that the FDA would determine that the product ever was unsafe. Mr. Meyer testified that the accepted potency range of 90 to 110 percent from label did not appear to have real value for enzymes which might better be expressed in terms of "not lower than" a stated level. Mr. Meyer also understood that enzymes such as papain might be particularly difficult to measure. Mr. Meyer is unaware of the FDA ever having taken a regulatory action against an enzymatic drug due to a range of potency issue.

Mr. Meyer is not aware of the FDA ever having taken a position different from the one they took in *Solvay,* namely, that there needs to be one definition of "generic"—the FDA's definition. Mr. Meyer agrees that a single definition of "generic" is appropriate and is "quite sure" the FDA has never taken another position on this issue. The only definition of "generic" of which he is aware is the one that was provided by CDER to require therapeutic equivalence which, in turn requires pharmaceutical equivalence and bioequivalence.[210] There is no definition of "generic" in the statutes. In Mr. Meyer's opinion, unapproved drugs cannot be "generic" drugs, but the same definition of "generic" applicable to approved drugs should be followed and two unapproved drugs would have to be demonstrated by science to be therapeutically equivalent in order for one unapproved drug to be considered generic to another unapproved drug.

Mr. Meyer has not seen any data that would show that Kovia is generic to Accuzyme and Ziox is generic to Panafil. Because there is demonstration of therapeutic equivalence or an "ab" rating in the Orange Book, Mr. Meyer agrees with Stratus' expert, Mr. Johnston, that in most states Kovia and Ziox cannot be substituted for Accuzyme and Panafil White, respectively. Therefore, in Mr. Meyer's opinion, it was misleading for Stratus to represent Kovia as "generic" or a "generic alternative" to Accuzyme and Ziox as "generic" or a "generic alternative" to Panafil or to call Kovia and Ziox "branded generic products."[211] Further, in Mr. Meyer's opinions it can be considered misleading to say that Kovia and Ziox have the "same active ingredients" or "same ingredients" as Accuzyme and Panafil, respectively,[212] because such statements suggest that the products will perform the same was but he has seen no data to show it. Finally, in Mr. Meyer's opinion it is misleading for Stratus to refer to Dr. Rheins' study of two pigs as an "in-vivo study"[213] because only two pigs were involved in the study and the data would not "remotely support" a finding of therapeutic equivalence or bioequivalence.

Mr. Gary G. Heyland, a pharmacist licensed under the laws of the State of Texas, was called as a witness by Healthpoint. Mr. Heyland testified that therapeutic equivalence and bioequivalence are needed before one prescription drug may be substituted for another. When he sees the word "generic" he understands that

210. PE 4.

211. See PE 71E, PE 71F, PE 74 and PE 76.

212. PE 29 and PE 30.

213. PE 29.

the drugs are therapeutically equivalent and bioequivalent. Mr. Heyland testified that he uses the computer at his pharmacy in order to determine if he can substitute. In brief, he enters the name of the drug prescribed and the computer lets him know if there is a generic to that drug. He knows that Bergen Brunswig, the largest or second largest drug wholesaler/distributor in the country, lists both Kovia and Ethezyme as "generic" to Accuzyme.[214] Based on the information on the Bergen Brunswig computer screen, he would ask the patient if he could substitute the lowest price "generic" for Accuzyme. Mr. Heyland would "guess" that approximately 80 percent of the market for Accuzyme would be hospitals, nursing homes and long-term care facilities and approximately 20 percent of the market would be retail. Mr. Heyland is aware that nursing homes and hospitals have formularies.

Charles R. Cervantes, Jr., M.D. was called as a witness for Healthpoint. Dr. Cervantes is licensed in Texas and is board certified in internal medicine with an added qualification of geriatric medicine.[215] Dr. Cervantes is a medical director of a nursing home. Dr. Cervantes has prescribed Accuzyme for "years with success."[216] Dr. Cervantes testified that when he writes a prescription that allows substitution, "I expect that substituted product is both a pharmaceutical and therapeutic equivalent."[217]

Healthpoint called Mr. Alberto Hoyo, the president of Stratus, to testify. Mr. Hoyo has been involved in the pharmaceutical business approximately 37 years. Mr. Hoyo, with others, started Stratus in approximately 1989. Stratus marketed its first product in approximately 1991. Mr. Hoyo considers the mission of Stratus to offer economical alternatives to the marketplace. Mr. Hoyo testified that he has described Stratus as a "branded generic company" and as a company that offers "economical alternatives." Stratus products sell for about one-half the price of competing brand name drugs.

Stratus currently employs approximately six salespersons to market its products and does not have a nationwide sales force. Stratus has marketed Kovia and Ziox by handing out product announcements,[218] product descriptions,[219] price lists,[220] flyers[221] and such items as company pens[222] and water bottles[223] at conventions and to drug wholesalers. Stratus hands out prescription pads to physicians at conventions and when sales calls are made to doctor's offices.[224] Stratus' first magazine ad for Kovia and Ziox appeared in the January/February 2001 issue of Wounds magazine.[225] Stratus representatives have conducted in-service clinics for wound care clinicians to create an awareness for the treatment of wounds and answer questions about their products. Stratus' total marketing budget for all of Stratus' products,

**214.** DE 22. *See also* PE 101 ("wholesaler new item fact sheet" which Stratus submitted to Bergen Brunswig in which, in brief, Stratus represented that Kovia was "generic" to Accuzyme).

**215.** PE 34.

**216.** PE 35.

**217.** PE 35.

**218.** PE 36A, PE 36B, PE 71E, PE 71F, PE 74 and PE 76.

**219.** DE 38 (a product brochure commonly called a "slim jim").

**220.** PE 111 (price list effective March 1, 2001).

**221.** DE 40.

**222.** DE 41.

**223.** DE 42.

**224.** DE 44.

**225.** DE 39.

including Kovia and Ziox, is $300,000–$400,000. Stratus has shipped to drug distributors approximately 20,000 tubes of Kovia [226] and approximately 6,000 tubes of Ziox.[227] Stratus has earned approximately $400,000 in revenues from Kovia and approximately $150,000–$200,000 in revenues from Ziox.

Stratus initially promoted both Kovia and Ziox as "generic" or "generic alternatives" or "economical alternatives" to Accuzyme and Panafil. Stratus handed out a total of approximately 100—150 of two "announcements" regarding Kovia at an American College of Dermatology convention held in San Francisco in March 2000.[228] These announcements, among other things, represented that Kovia was "generic to" Accuzyme; one of the announcements also stated that Stratus offered "brand names at generic prices." [229] In addition, Mr. Hoyo believed that approximately 60–70 copies of another flyer which described Kovia as "generic to" Accuzyme and Ziox as "generic to" Panafil probably were handed out at the same convention.[230] Stratus no longer hands out these announcements.

Mr. Hoyo testified that Stratus has submitted information to states, including Texas and Alabama, seeking the inclusion of Kovia and Ziox in state medicaid formu-laries for medicaid reimbursement. Mr. Hoyo acknowledged that the information which Stratus submitted to Texas for this purpose included the representation that Kovia was a "generic" to "brand name" Accuzyme., but this was "a mistake." [231] Mr. Hoyo testified that Kovia should have been referred to as the "brand name" and "papain/urea debridement ointment" should have been the "generic" name. But, Mr. Hoyo testified that, despite the attestation on the form submitted to Texas that all "information is correct to the best of my knowledge" and "any changes in . . . product status" would be reported to the State within fifteen days, no corrected information was submitted to the state. Similarly, the information which Stratus submitted to Texas regarding Ziox referred to Panafil as the "brand name" and Ziox as the "generic name." [232] And, information which Stratus submitted to the State of Alabama for inclusion in the Alabama state formulary referred to Kovia as "generic to" Accuzyme.[233]

Mr. Hoyo testified that "wholesaler new item fact sheets" were submitted to Alabama, as noted above, to major drug wholesalers such as Bergen Brunswig,[234] to First Data Bank which provides information on drug products to its customers,[235] and to others.[236] In each case, the section

---

226. PE 70 (23,774 units of Kovia shipped as of April 27, 2001).

227. PE 70A (5,509 units of Ziox shipped as of April 27, 2001).

228. PE 36A, PE 36B.

229. PE 36 A and PE 36B.

230. PE 71E.

231. PE 48.

232. PE 49.

233. PE 65 at 1 and 5. The cover memorandum referred to Kovia as "generic to" Accuzyme and Stratus forwarded a "wholesaler new item fact sheet" in which information "for generic drug products" was completed, referring to Accuzyme as a "brand name equivalent."

234. PE 98 and PE 101.

235. PE 59 and PE 62. Mr. Hoyo testified that the "wholesaler new item fact sheet" for Kovia admitted as PE48A would have been submitted to First Data Bank.

236. Mr. Hoyo testified that forms like PE 48A have been distributed to drug wholesalers but he could not recall if a hospital pharmacy or group purchasing organization or a nursing home had requested the form, but if any had, the form would have been provided.

"for generic drug products" was completed for Kovia with Accuzyme listed as the "brand name equivalent" and "papain-urea debriding ointment" listed as "generic name for brand." A similarly completed form was submitted to First Data Bank for Ziox that listed Panafil as the "brand name equivalent" to Ziox.[237]

Mr. Hoyo testified that he understood that when the part of the form "for generic drug products" was completed it meant only that there was a "trade name in the market." But, this explanation would not account for the representation made to Bergen Brunswig in the cover memo to which a "wholesaler new item fact sheet" for Kovia was attached which stated that Kovia was "generic to" Accuzyme.[238] In response to questions from his counsel, Mr. Hoyo testified that his understanding of the word "generic" as used on that form and as used in "the trade"[239] is that the drugs have the same active ingredients, the same strength, the same dosage form and the same route of administration.[240] He does not believe that First Data Bank or drug wholesalers consider such terms as therapeutic equivalent, bioequivalent or pharmaceutical equivalent. His understanding of the phrase "brand name equivalent" on that form is simply a request for the name of another product on the market that has the same ingredients, strength, dosage form and route of administration. When Stratus indicated on the

"wholesaler new item fact sheets" that there was a "brand name equivalent" to Kovia or Ziox, his understanding would be that Stratus was representing that there was another product on the market, but not to claim therapeutic equivalence.

At some point in time, Mr. Hoyo knows that a decision was made to stop referring to Kovia and Ziox were "generic to" the Healthpoint products. Mr. Hoyo testified that he recalled that the decision was made in approximately August 2000, but the "wholesaler new item fact sheet" for Ziox was submitted to First Data Bank on October 30, 2000[241] and a "wholesaler new item fact sheet" for Kovia was dated February 16, 2001[242] and was submitted to First Data Bank on April 19, 2001.[243] Further, Stratus' price list effective February 16, 2001 refers to Kovia and Ziox as "Stratus branded prescription generic products"[244] and in his deposition taken in May 2001 Mr. Hoyo referred to Stratus as a "branded generic company."

Mr. Hoyo testified that Sonar Products, Inc. manufactures Kovia and Ziox for Stratus. Mr. Hoyo and his family owns 25% of Sonar. Sonar manufactures products for companies in addition to Stratus and has never been issued a warning letter by the FDA. Mr. Hoyo agreed that an August 14, 2000 FDA inspection report for Stratus found that "none" of the methods used for the analysis of finished product have been shown to be "stability indicating."[245] The

237. PE 59.

238. PE 98 at 1; see also PE 65 at 1 (similar memorandum submitted to Alabama medicaid formulary)

239. Mr. Hoyo testified that by "the trade" he means drug wholesalers, First Data Bank and pharmacies.

240. Under Texas law, this definition is similar to that for "pharmaceutically equivalent." § 562.001(2), Tex. Occupations Code (West, 2000). Texas law requires both pharmaceutical equivalence and therapeutic equivalence for a drug to be "generically equivalent". Id. at § 562.001(1).

241. PE 59.

242. PE 68. It is not known to whom this "fact sheet" was distributed.

243. PE 62.

244. PE 69.

245. PE 125 at 1.

report also found that "[h]omogeneity studies used in process validation were not always complete prior to distribution of the product. For example, samples of Kovia batch numbers 5025 and 5041 were sent for homogeneity testing after release of the batches."[246] Mr. Hoyo declined to agree that any problems with Sonar's stability and homogeneity testing would have failed to detect a lack of papain in lot 5025 or low levels of papain in lots 5025 and 5041.[247]

Mr. Hoyo testified that Kovia lot 5025 is no longer being shipped and only lot 5041 is being shipped. Mr. Hoyo would estimate that approximately 20% of the Kovia and Ziox that has been manufactured and shipped was shipped to retail pharmacies and approximately 80% of Kovia and Ziox that has been shipped has been shipped to institutions, approximately the same break-down of distribution as Kovia and Ziox.

Mr. Hoyo testified that Kovia contains $1.1$ times $10^6$ of papain and acknowledged that Accuzyme contains $8.3$ times $10^5$ of papain.[248] Mr. Hoyo agreed that Kovia and Accuzyme would have to have the same amounts of papain to be therapeutically equivalent, but was not willing to admit that Kovia and Accuzyme do have different amounts of papain. Mr. Hoyo testified that if Healthpoint can say that the potency of Accuzyme did not change when it switched from $1.1$ times $10^6$ as measured by USP Lot F to $8.3$ times $10^5$ of papain as measured by USP Lot G,

then, to Mr. Hoyo's mind, he can say that Kovia, which has $1.1$ times $10^6$ of papain as measured by USP Lot G is the same potency of papain as Accuzyme which has $8.3$ times $10^5$ as measured by USP Lot G. Mr. Hoyo testified that when he uses the phrase "same ingredients" or "same active ingredients" he does not necessarily mean the same amounts of the ingredients, just that the ingredients are the same.[249]

Mr. Hoyo testified that no human testing had been performed with Kovia and no testing at all had been performed with Ziox. The only study of Kovia was a test on two pigs which had been burned and then treated with Kovia and Accuzyme which showed that the two ointments debrided the wounds similarly.[250] Stratus has handed out copies of this study at a trade show in Las Vegas and mailed it to First Data Bank in April 2001.[251] Stratus has never claimed and/or has no studies to show that Kovia is therapeutically equivalent or bioequivalent to Accuzyme, or that Kovia and Ziox have the same bioavailability as Accuzyme or Panafil, respectively. In those states that require bioavailablity or therapeutic equivalence, Kovia and Ziox could not be substituted for Accuzyme and Panafil. Mr. Hoyo believes that both Kovia and Ziox are pharmaceutically equivalent to Accuzyme and Panafil. Since informing Bergen Brunswig, First Data Bank and others that Kovia and Ziox were "generic" to Accuzyme and Panafil, respectively, Stratus has not informed any drug

---

246. PE 125 at 2.

247. Mr. Hoyo testified that DE 47 was Sonar's response to the FDA's inspection report and that Sonar heard nothing further from the FDA after submitting its response.

248. PE 18.

249. See PE 113 (affidavit of Alberto Hoyo) ("Kovia, as an alternative to Accuzyme, contains the same active ingredients ($1/1 \times 10^6$

units of papain) of Accuzyme as well as 100 mg of urea"); docket no. 69 at 5–6 (Stratus' counterclaim) (it is misleading for Healthpoint to state that "the other products on the market which contain **the same active ingredients in the same amounts** as stated on Accuzyme's label are not therapeutically equivalent to Accuzyme.") (emphasis added).

250. PE 73A.

251. PE 63.

distributor, wholesaler or wound care clinician that they are not "generic."

Mr. Hoyo testified that Kovia and Ziox are not "generic" to Accuzyme or Panafil White, as testified to by Stratus' own expert, Mr. Johnston. Mr. Hoyo agreed that if there is a misimpression in the marketplace that Kovia and Ziox are generic to Accuzyme and Panafil White, measures should be taken to remove that impression. Mr. Hoyo declined to agree that Stratus created such an impression, however.

Mr. Hoyo testified that he understood that Stratus has submitted the lowest bid to the Cook County Hospital in Illinois but that the bid had been awarded to Healthpoint instead. But. Mr. Hoyo agreed that Stratus represented to Cook County Hospital On October 4, 2000 that Kovia is "generic of" Accuzyme [252] and that Kovia and Accuzyme are "bioequivalent." [253]

Mr. J.R. Locey, the director of sales for the western region of Healthpoint, testified for Healthpoint regarding Healthpoint's marketing practices and related issues. Healthpoint promotes its products nationwide with an annual budget of approximately $4.3 million last year to market both Accuzyme and Panafil. Accuzyme, launched in 1996, realized sales of approximately $8.3 million. Panafil realized about $9 million in sales last year.

Both Accuzyme and Panafil are listed on most state medicate formularies and on numerous hospital and long term care formularies. Mr. Locey has conducted "in service" training for nurses and wound care clinicians on the products.

Mr. Locey testified as to Accuzyme's recent label revision prompted by Healthpoint's change from the lot F to lot G USP standard for papain. Although the USP standard changed and label changed, Mr. Locey testified that the formulation of papain has remained the same since Accuzyme was introduced into the market. Healthpoint currently is shipping Accuzyme only with the new label showing papain at 8.3 times $10^5$.[254] In his opinion, Kovia and Accuzyme do not have papain at the same strength because 8.3 times $10^5$ does not equal 1.1 times $10^6$.

Mr. Locey received a copy of Stratus' comparative study of Kovia and Accuzyme [255] from a co-worker when Mr. Locey was present at a convention in Las Vegas. The co-worker who obtained the Stratus study from the Stratus booth told Mr. Locey that Stratus was not only saying Kovia and Accuzyme were chemically the same but clinically the same.

Mr. Locey testified that at the time he stated that Stratus had no sales force for Kovia [256] he believed that to be the case; he now is aware that Stratus does have a small sales force. In his opinion, Kovia is not pharmaceutically equivalent to Accuzyme, but he is not claiming to be an expert.

Mr. Locey acknowledged that if First Data Bank links and lists Kovia along with Accuzyme but rates Kovia as "zb" which means either that the products are nonprescription or that the products have not been determined to be therapeutically equivalent then users of the First Data Bank database must not know what "zb" means when they allow substitution. It was his understanding that Healthpoint communicated with Bergen Brunswig and Cardinal about changing their computer linkages of the Healthpoint products and the Stratus products, but that they refused

252. PE 127.

253. PE 126.

254. PE 11, 15, 16, 17 and 20.

255. PE 73A.

256. DE 10 and DE 28.

because they had been told by Stratus that the products were "generics." Mr. Locey understood that the Healthpoint letter that stated there were no "ab" rated equivalents to Accuzyme went to approximately 39,000 addresses.

Mr. Locey testified about the operation of formularies and group purchasing contracts and the process by which less expensive "generics" are substituted for higher cost prescription products when the drug products are true "generics."

Mr. Locey testified that the rate of growth for both Accuzyme and Panafil has slowed which he believes is attributable to substitution or that substituted products are not working as well and that is hindering the Healthpoint products. Mr. Locey believes the gross profit for Accuzyme is approximately 90%, not accounting for marketing and research and development costs.

Mr. Larry Anderson, a DPT Laboratories chemist, testified for Healthpoint regarding how he learned of the change in the USP reference standard for papain from F to lot G, and Accuzyme's label change caused by its change from lot F to lot G. Mr. Anderson testified that Accuzyme's formulation has never changed and if Accuzyme's current product (with 8.3 times $10^5$ of papain using Lot G) were measured against Lot F, it would measure 1.1 times $10^6$. Mr. Anderson provided some testimony relating to the range of potency of papain in Accuzyme.[257]

Mr. Anderson also testified of tests performed of Kovia between September 2000 and April 2001. Tests of lot 5025 of Kovia showed "surprisingly low, virtually negligible levels of papain and tests of lot 5041 of Kovia showed papain activity", but only at a level of approximately 500 USP units per milligram. Mr. Anderson performed tests of lot 5025 and lot 5041 himself and tests in January and April 2001 were performed by Southern Laboratory, an independent laboratory in North Carolina contracted tot o the work. The results of the tests by Southern Laboratory showed findings similar to those reached in the tests conducted by Mr. Anderson.[258] Mr. Anderson did not how the two cartons of Kovia purchased from the Olmos Pharmacy in San Antonio, Texas had been handled by the pharmacy or others prior to purchase or how they had been transported the few miles from the Olmos Pharmacy to DPT Laboratories.

Ms. Angela Davis, a sales representative for Healthpoint, testified, among other things, as to a conversation which she had with Ms. Peggy Goodnight, a pharmacist employed at the KMART pharmacy in Temple, Texas in February, 2001.[259] Through a conversation with a physical therapist who works at a hospital in Temple, Texas, Ms. Davis became aware of a prescription that apparently had been written for Accuzyme but had been filled with Kovia. Ms. Davis talked to the pharmacist about whether a substitution had occurred. Ms. Davis told the pharmacist that Kovia was not in the Orange Book and had not been determined to be therapeutically equivalent to Accuzyme. Ms. Davis gave the pharmacist a Healthpoint letter concerning Kovia, a "slim jim" or product description for Accuzyme and an "urgent update" that informed the reader that Accuzyme did not have sodium metabisulfite.[260] Ms. Davis has "no doubt" she did not saying to Ms. Goodnight about Kovia having sodium metabisulfite, though she testified that she also gave Ms. Goodnight a copy of a Healthpoint letter regarding another competing

**257.** Sealed DE 32.

**258.** PE 45.

**259.** PE 115.

**260.** DE 36, PE 116 and PE 117.

product Ethezyme (which does contain sodium metabisulfite).

Gordon Johnston was called as Stratus' first witness. Mr. Johnston, currently employed as an associate at a firm that does consulting on regulatory affairs involving drugs, is a pharmacist by training and experience. Mr. Johnston worked at the FDA between approximately 1987 and 1999, starting with the FDA as a labeling reviewer, then working in regulatory support, and then serving as deputy director for the FDA's office of generic drugs, the position he held at the time of his retirement.[261] Mr. Johnston was retained as Stratus' expert witness to provide expert opinions regarding the lawfulness of Kovia and Accuzyme.[262]

Mr. Johnston testified that under the federal drug regulatory scheme, there are three, or possibly four categories of drugs—pre–1938 drugs, GRAS/E drugs, and drugs approved through submission of a new drug application ("NDA") or abbreviated new drug application ("ANDA"). Accuzyme—and Kovia (and, for the same reasons Ziox)—do not fall in any of those three categories and, therefore, are illegal drugs. Mr. Johnston testified that, in his opinion, although a fourth category of drugs—those with and "undetermined" status—exists under the regulatory scheme, such drugs are not legal drugs, though he conceded that others might conclude otherwise.[263] In other words, Mr. Johnston testified that although the "marketing status" of Accuzyme and Kovia (and Ziox) is "undetermined," they are illegal drugs because they do not fall in any one of the three categories of approved drugs. Mr. Johnston testified that approximately 4,000 drugs first marketed between 1938 and 1962 are being marketed today without express FDA approval. Under FDA Compliance Policy Guide ("CPG") 7132c.02, first issued in 1976 and then revised in 1981, 1984, 1987 and 1995, the FDA set up a procedure under which the FDA would review such unapproved drugs.[264] Mr. Johnston conceded that the FDA has tolerated the marketing of Accuzyme and Panafil for years, inspects the manufacturing facilities of Healthpoint, and has taken no action against Healthpoint or, DPT Laboratories, its manufacturer, because Accuzyme and Panafil are illegal. On re-direct, Mr. Johnston reaffirmed that the FDA was in the best position to decide on whether drugs are safe, effective, or generic equivalents.

Mr. Johnston testified that he was not aware of any one definition of "generic" as used by the FDA in the NDA and ANDA process. To his mind, "generic" is a more of a "commodity" term, indicative of "price," whereas "generically substitutable" implies to him that the drug product is "generically equivalent" which, in turn, means that the drug has been reviewed and found to be therapeutically equivalent and bioequivalent. State law determines whether substitutions are legal or not and most states rely on the FDA's Orange

---

261. DE 16 (Mr. Johnston's one-page resume without dates).

262. DE 21 (Mr. Johnston's report); Mr. Johnston's opinions on lawfulness would apply equally to Ziox.

263. PE 1. On June 1, 2000, the law firm of McKenna & Cuneo prepared an opinion letter for Stratus about its proposed marketing of Kovia without an approved NDA or ANDA which opined, among other things, that drugs in the undetermined status may be marketed lawfully (PE 1 at 4), with "low" risk of an FDA enforcement action (PE at 5), on the assumptions that no safety issues arise regarding Kovia and that Kovia is "similar" in dosage form route of administration, indication for use, and intended "patient population" as Panafil White, a "DESI–2 papain/urea ointment" (PE 1 at 5–6).

264. *See* PE 28.

Book's rating system to know if drugs may be substituted.[265] On cross examination, Mr. Johnston testified that the definition of "generic" was different for approved and unapproved drugs though, when viewing the definition of "generic" drugs on the FDA's Office of Generic Drugs website,[266] Mr. Johnston testified that he was not aware of any statement by the FDA that this definition was limited to approved drugs only. He agrees that the FDA would prefer having one definition of "generic."[267] Mr. Johnston testified that in most states it would be illegal to substitute Kovia for Accuzyme because therapeutic equivalence had not been demonstrated.

Although Mr. Johnston never worked for the Division of Drug Marketing, Advertising and Communications ("DDMAC") within the FDA, he is aware of "egregious cases" of false or misleading promotional materials in which the FDA has issued "warning letters" asking the company to stop the misleading promotions, but without asking for corrective advertisements or recalls of products. Mr. Johnston is not aware of FDA advertising guidance specifically addressing unapproved drugs. Mr. Johnston acknowledged that claims of comparability regarding approved drugs are subject to the same standards of review as claims of safety and efficacy such that they must be demonstrated by substantial evidence or substantial clinical experience.[268] Mr. Johnston appeared to concede that it would not make any sense for the FDA to have a lesser standard for claims of comparability for unapproved drugs. When viewing specific letters issued by the FDA,[269] Mr. Johnston testified that the FDA has taken the position that

drug owners may not make claims of equivalence regarding unapproved drugs without substantiation. On re-direct, Mr. Johnston seemed to testify that the FDA was also equipped to decide whether a claim was one of comparability and whether it was substantiated, stopping short of expressing any opinion on whether the Lanham Act was "preempted" by an argument that the FDA has primary jurisdiction in this area. In his opinion, a claim that two products have "the same" ingredients is not a claim of comparability because it does not concern efficacy. In his opinion, a promotion that asks the reader to "compare" one drug "to" another drug does not suggest substitution, equivalence or therapeutic equivalence.

Mr. Johnston testified that if there are two products that are labeled with the same active ingredient but at different strengths but tests show that what is inside the tubes is the same, the substances might be pharmaceutically equivalent or there might be a problem with the label or assay.

In his opinion, it would be misleading for a company to suggest that an unapproved drug is a "substitute for" a name brand unapproved drug or that an unapproved drug is "generic" to a name brand drug. Mr. Johnston testified that Stratus' study of Accuzyme and Kovia on two burned pigs would not be sufficient to show that Accuzyme and Kovia are bioequivalent and that, generally, testing on humans is needed to show bioequivalence. Mr. Johnston has seen no data that would show that Accuzyme and Kovia are pharmaceutically equivalent. Mr. Johnston says he so advised

265. Mr. Johnston explained that the "a" rating in the Orange Book means that the FDA has determined that two drugs are interchangeable but a "b" rating means either that there has been no determination of equivalence or that data has been presented that they are inequivalent.

266. PE 4.

267. *See* FDA's amicus brief in *Solvay*, PE 13.

268. PE 2 and PE 3.

269. PE 5, PE 6, PE 7 and PE 8.

Stratus approximately two weeks before the May 7 hearing.

Stratus also called Mr. Hoyo, reserving its cross examination of Mr. Hoyo until such time as he was called as a witness for Stratus. For clarity, the Court's findings based on Mr. Hoyo's testimony, whether relating to Healthpoint's direct or his subsequent examination, have been summarized above.

### c. conclusions on likelihood of success

 Healthpoint has demonstrated a likelihood of succeeding on its claim that Stratus falsely advertised Kovia as "generic," a "generic alternative," a "branded generic" or "brand name" with "generic" price to be compared to Accuzyme, or is "bioequivalent" or "equivalent" to Accuzyme. Healthpoint also has demonstrated a likelihood of succeeding on its claim that Stratus falsely advertised Ziox as "generic," a "generic alternative," a "branded generic" to be compared to Panafil, or is "equivalent" to Panafil. These representations suggest that the drugs are interchangeable and that there has been a determination of equivalence and Healthpoint has demonstrated a likelihood of success in establishing that Stratus has insufficient support for a claim of equivalence.[270] Healthpoint has sustained its burden of showing likelihood of proving that Stratus' two ointments do not have "therapeutic equivalence," "pharmaceutical equivalence," "bioequivalence," or "generic equivalence" to Healthpoint's two ointments such that its use of such terms as "generic" and "generic equivalents" is misleading.[271]

In each of the areas noted above, Healthpoint has demonstrated a likelihood of success on the merits on its false advertising claim, in general, and on demonstrating falsity/misleading statements and tendency to deceive, in specific. Healthpoint has established that it is likely to succeed in showing that even sophisticated consumers such as pharmacists incorrectly concluded Kovia is "generic" to Accuzyme and Ziox is "generic" to Panafil White and may be substituted[272] even though the substitution may not be lawful under state law. Nothing in Stratus' subsequent and current representations about Kovia and Ziox would be sufficient to indicate to even the sophisticated consumer that Kovia and

---

270. An alternate ground to decide the likelihood of success on false claims of generic equivalence would be to hold that Kovia and Ziox cannot be "generic" of their Healthpoint counterparts because neither had an approved ANDA and, indeed, cannot submit an ANDA since there is no NDA for either Healthpoint product. The term "generic," however, is not used in the FDCA or FDA regulations but is an FDA and industry term of art. Therefore, the undersigned concludes that the FDA has the primary jurisdiction to determine whether Kovia or Ziox in fact are "generic." Cf. PE 5, PE 5, PE 7 and PE 8. This Order addresses only Lanham Act false or misleading advertising claims regarding the equivalence of drugs.

271. *Sandoz Pharms. Corp.*, 902 F.2d at 228 n. 7 ("[t]his case does not require us to address the question of whether completely unsubstantiated advertising claims violate the Lanham Act absent proof that consumers are actually misled by this lack of substantiation. In such a case, there is a plausible argument that the claim is literally false because the advertiser has absolutely no grounds for believing that its claim is true. A Lanham Act plaintiff may be permitted to presume that consumers expect advertisers to have at lease some semblance of support for their publicly-disseminated claims.").

272. McCarthy on Trademarks and Unfair Competitor § 27:55 (4th ed.2001) ("However, on a motion for preliminary injunction, a survey is not always necessary and it is sufficient if plaintiff introduces expert testimony or any other evidence that a significant number of consumers received the claimed message from the advertisement."). *See* testimony of Mr. Gary Heyland and Dr. Cervantes.

Ziox are not "generic" and freely substitutable.

"When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfies the requisite showing of irreparable harm." [273] In any event, with respect to the areas noted above, Healthpoint demonstrated irreparable harm; [274] irreparable injury that could not adequately be compensated for through an award of money damages; [275] and that the injunction would not disserve the public interest. Indeed, the tailored scope of this injunctive relief, in essence, "freezes the *status quo* and is intended 'to preserve the relative positions of the parties until a trial on the merits can be held.' " [276]

■■■ For purposes of issuance of a preliminary injunction, Healthpoint has not demonstrated a likelihood of succeeding on its other claims, including that Stratus has falsely stated that Kovia has "similar clinical effects" based on the Stratus sponsored study of two pigs in California; or that Kovia and Ziox are "economical" and "high quality" alternatives to Accuzyme and Panafil White, or that Kovia and Ziox do not have the "same ingredients" or the "same active ingredients" as Accuzyme and Ziox. [277]

Based on the current record and the First Amendment, it is not appropriate to enter a preliminary injunction to prevent Stratus from mentioning any Healthpoint product in its advertisements of Kovia and Ziox or from making any comparisons of Kovia to Accuzyme or of Ziox to Panafil White, so long as Stratus has support for any statements it makes and the statements are not misleading.[278]

273. *United Indus. Corp. v. Clorox,* 140 F.3d 1175, 1183 (8th Cir.1998) (citing *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.,* 633 F.2d 746, 753 n. 7 (8th Cir.1980) ("To obtain an injunction under section 43(a) appellees need only show that the falsities complained of had a tendency to deceive."); *McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988) (where challenged advertisement directly, but falsely, proclaims superiority of defendant's product over plaintiff's, irreparable harm may be presumed)).

274. Healthpoint has demonstrated a likelihood of establishing that Kovia has been substituted for Accuzyme by pharmacists. *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 192 (2d Cir.1980) ("While proof of actual diversion of sales is not required for a § 43(a) injunction to issue, proof that the advertising complained of is in fact false is essential.").

275. *DFW Metro Line Servs. v. Southwestern Bell Tel. Co.,* 901 F.2d 1267, 1269 (5th Cir. 1990) (when money damages would adequately compensate, a showing of irreparable harm is precluded).

276. *Wenner,* 123 F.3d at 326 (*quoting Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

277. Although there is evidence to show Kovia contains 1.1 times $10^6$ USP units of papain under the Lot G standard and that Accuzyme now contains 8.3 times $10^5$ USP units of papain under the Lot G standard, Healthpoint has not demonstrated a likelihood of showing that such a difference is a different in ingredients or active ingredients. Further, whether an ingredient should be termed "active" or "inactive" is a matter committed to the FDA. Finally, Healthpoint has not demonstrated a likelihood of showing that Ziox and Panafil White, each represented to have "not less than 521,700 USP units" of papain have different ingredients or active ingredients.

278. *Hypertherm, Inc. v. Precision Prods., Inc.,* 832 F.2d 697, 700 (1st Cir.1987) ("In the entrepreneurial world, as elsewhere, copycats have always been common place. Given these verities, it follows logically that a firm, like PPI, which has labored (lawfully) to replicate another's parts may ordinarily use the trademark descriptively, that is, to identify the product it has copied, so long as no misrepresentation is made and no confusion is generated as to the source, sponsorship or identity of the ersatz goods."); *G.D. Searle & Co. v. Hudson Pharm. Corp.,* 715 F.2d 837, 843 (3rd Cir.1983) ("In short, whether one is entitled to refer to a competitor's trademark depends not on where the reference appears but on whether the reference is truthful").

The Court has carefully considered Healthpoint's argument that, in the context of the other representations, it is misleading for Stratus to continue to promote Kovia and Ziox as "alternatives" when Stratus has done nothing to correct the misleading "wholesaler new item fact sheets" submitted to drug wholesalers and used in computer data bases that represent Kovia and Ziox as a "generic drug product"[279] or the information submitted to the Texas[280] and Alabama[281] medicaid formularies that represent Kovia and/or Ziox as "generic" drugs. The Court observes that Stratus' argument that Stratus cannot control how distributors and First Data Bank displays information submitted to it on computers misses the mark; Stratus has admitted that certain wholesaler new item fact sheets were not completed correctly; the Court has found that Healthpoint has established likelihood of success on its claims that Stratus made material misrepresentation about Kovia and Ziox; and Stratus may be required to take affirmative action to correct the effects of its misrepresentations. But, the final assessment on the scope of remedial action should await a decision on the merits.

■■■■ Conversely, Stratus has not demonstrated a likelihood of succeeding on its claim that Healthpoint engaged in false advertising when it stated that it is illegal or otherwise in violation of federal or state law to prescribe, dispense or administer Kovia in place of Accuzyme; Kovia is not an alternative to Accuzyme; there are not generic equivalents to Accuzyme; Kovia is not an alternative to Accuzyme because it is not "AB" or "A" rated; that Accuzyme has been approved by the FDA; or that Stratus puts out inferior drugs. Stratus either has not demonstrated a likelihood of showing that the claims (as alleged) were made, or that claims were not literally true, or that the claims, in context, were likely to mislead. Stratus has not demonstrated likelihood of success on its claim that Healthpoint has represented Kovia has sodium metabisulfite.[282] Alternatively, if Stratus has demonstrated a likelihood of success, it has not demonstrated irreparable harm if preliminary relief does not issue.

■■■■ Although any movant need not prove its case in a preliminary injunction context, a motion for preliminary injunction should be denied when a court is required to resolve complex questions of fact and law and/or where money damages would adequately compensate a movant. Also to be deferred to the decision on merits are the parties' competing requests that its competitor be required to engage in corrective advertising.[283] "The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits."[284] Deferring corrective advertising until the decision on the merits avoids the unnecessarily harsh and possibly confusing possibility of multiple corrective advertisements. The trial on the merits in this case is less than six months away.

279. *E.g.,* PE 48A, PE 59, PE 62, PE 68, PE 98 and PE 101.

280. PE 48.

281. PE 65.

282. Docket no. 160.

283. A District Court has broad power in equity to take affirmative steps to eliminate possible consumer confusion. *B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1269–70 (5th Cir.1971).

284. *GTE Corp.,* 731 F.2d at 678.

## 2. *Irreparable Injury*

With respect to the recommended preliminary injunction, the findings as to tendency to deceive satisfy the requisite showing of irreparable harm as to the false claim that Kovia and/or Ziox are "generic" or "generic equivalents" or "branded generic" drugs or "branded prescription" products or "branded Rx products" or "branded prescription generic products" or a "brand name[ ] at generic prices".[285]

■ With respect to the preliminary injunctive relief requested but not ordered, the Court had determined that neither side has demonstrated likelihood of success and determines that neither side has demonstrated irreparable injury. Both sides argue that if a preliminary injunction does not issue, they will lose good will, suffer damage to reputation, will lose customers and suffer damages. Injuries adequately remedied by monetary damages are not irreparable.[286] Assertions of injuries not supported by evidence fail to establish clearly irreparable harm.[287] In light of the determination that likelihood of success has not been demonstrated for purposes of a preliminary injunction, the alleged harm each side would suffer is more speculative and, on balance, does not serve to tip the balance of equities in either side's favor.[288]

Although the evidence shows that Healthpoint distributed a letter which stated "Accuzyme has no AB rated equivalent" which Stratus argues falsely implied that Accuzyme had FDA approval and that Kovia (not named in the letter) needed to be "AB" rated,[289] Stratus has not demonstrated irreparable harm if a preliminary injunction does not issue to stop further

similar representations. The statements in the letter appear to be literally true—a drug is being represented as a "generic" to Accuzyme but, under federal law, manufacturers must seek approval to market a generic drug by demonstrating therapeutic equivalence but the FDA has not received data from any pharmaceutical organization to demonstrate that its product is equivalent to Accuzyme.[290] Nor, has there been evidence submitted to show that there is a current drug product which has demonstrated therapeutic equivalence, pharmaceutical equivalence, bioequivalence or generic equivalence to Accuzyme.

■ What is arguably misleading about this letter is that the parties agree that there is no FDA procedure for a company to seek a determination of therapeutic equivalence to a non-approved drug. But, the answer to this regulatory situation is not to seek a judicially crafted set of procedures by which a purported duplicate of a non-approved drug can seek to demonstrate therapeutic equivalence. Nor, is the answer to the regulatory situation for the court to "wash its hands" of Lanham Act claims regarding the marketing and promotion of a purported duplicate of a non-approved drug simply because the FDA has not established a procedure for approving such a duplicate as a "generic" and has not yet determined whether either of the drugs are, in effect, equivalents to a grandfathered drug or entitled to an exemption from the new drug approval requirements. Rather, the proper judicial approach is for the Court to defer to the FDA for the resolution of issues within its primary jurisdiction and to exercise juris-

**285.** *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d at 38.

**286.** *DFW Metro Line Servs.*, 901 F.2d at 1269.

**287.** *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.1985).

**288.** *United Indus. Corp. v. The Clorox Co.*, 140 F.3d at 1184.

**289.** PE 113, attachment 1.93 at 1.

**290.** PE 113, attachment 1 at 1.

diction over Lanham Act and other claims which do not require application or construction of FDA law, regulations or policy. Sponsors of drugs may be required to show they can substantiate claims of comparability in a Lanham Act case even though the ultimate determination of "equivalence" (therapeutic, pharmaceutical, bio and/or generic) is a matter for the FDA.

### 3. *Balancing*

Both sides argue that the costs to be incurred if its respective preliminary injunction is ordered is outweighed by the harm if its preliminary injunction does not issue. With respect to the preliminary injunctive relief ordered, the costs are relatively minor. With respect to the preliminary injunctive relief requested but not ordered, the Court determines that, based on the current showing of likelihood of success on the merits, the balance of the equities, based on the current record, is not tipped in favor of further preliminary injunctive relief.[291]

### 4. *Public Interest*

■ The public interest is served by accurate drug advertisements. Therefore, the public interest is served by the preliminary relief recommended. On the other hand, absent a more substantial showing of claims, neither Healthpoint nor Stratus

has shown that denying injunctive relief, as recommended herein, will disserve the public interest on the current record.

## VI. *CONCLUSION*

The undersigned orders that: Healthpoint's motion for a preliminary injunction [292] be *granted in part and denied in part*; Stratus' cross motion for preliminary injunction [293] be *denied*. Stratus, its agents, servants, employees and attorneys should be and hereby is enjoined from advertising, representing or implying to anyone, directly or indirectly, in any form of communication that Kovia and/or Ziox are "generic" [294] or "generic alternatives" [295] or is to be compared as a "generic alternative" to Accuzyme and Panafil White, respectively; that Kovia is "bioequivalent" to Accuzyme; [296] that Kovia and/or Ziox are "branded generic products," [297] "branded generic Rx products" [298] or "branded prescription generic products;" [299] that Kovia is a "brand name[ ] at generic prices." [300] No security shall be required pursuant to FED.R.CIV.P. 65(c).[301]

**291.** *National Football League Properties,* 808 F.Supp. at 1295 ("Where the defendant's likely harm if the injunction is granted is equal to or greater than any injury threatened by defendant's conduct, injunctive relief is generally denied. *Apple Barrel Prod. Inc. v. Beard,* 730 F.2d 384, 389–90 (5th Cir.1984)").

**292.** Docket no. 17.

**293.** Docket no. 70.

**294.** PE 36A, PE 36B, PE 71E and PE 127. See also the wholesale new drug information forms admitted as evidence.

**295.** PE 74.

**296.** PE 126.

**297.** PE 71F.

**298.** PE 76.

**299.** PE 69.

**300.** PE 36B.

**301.** Neither side requested or has established the need for security.